IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| The United States of America, | ) | |
| | ) | C.A. No. 2:01-0155-23 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Charleston County, South Carolina | ) | |
| Charleston County Council; John O. | ) | |
| Conlon, Toi Ahrens Estes, Cindy M. | ) | |
| Floyd, Curtis E. Bostic, A.D. Jordan, | ) | |
| Barrett S. Lawrimore, Timothy E. | ) | |
| Scott, Leon E. Stavrinakis, Charles | ) | |
| Wallace, members of Charleston | ) | |
| County Council; Charleston County | ) | |
| Election Commission, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| Lee H. Moultrie, George Freeman | ) | |
| Maggie McGill, and Sandra Flower, | ) | C.A. No. 2:01-562-23 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| Charleston County Council and | ) | |
| Charleston County Election | ) | |
| Commission, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This matter was tried without a jury beginning on July 15, 2002. The United States has

alleged that the at-large method of electing the nine-member Charleston County Council violates

Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973 ("Section 2"),

because it results in the unlawful dilution of minority voting strength. The Court–having heard

the arguments, read the submissions of counsel, and considered the evidence including court-

room testimony, deposition testimony, and exhibits–enters judgment for the United States of America and partial judgment for Plaintiffs Moultrie, Freeman, McGill, and Flower based on the following findings of fact and conclusions of law.

As an initial matter it is important to clarify what this Order rigorously says about the at-large electoral system of Charleston County and what it unequivocally does *not* say about her citizens. The Court recognizes that its decision does not merely operate mechanically against a political subdivision of the State of South Carolina but in fact against individual citizens whose lives in various measure are today changed. While the Court is otherwise disinclined to editorialize, those individuals, whether white or black,[1] who have had no voice in this debate but whose liberties are invariably altered by its resolution, deserve as clear and direct an explanation of this action as can be reasonably provided. There is a fundamental gravity to any decision of a federal court which calls into question actions taken by the people through the legislative process of their local and state communities. Federalism and separation of powers demand vigilant consideration.

With that said, this Order is radically not a condemnation of the citizenry of Charleston County but rather a recognition that the specific bulwark of an at-large system, in twisted concert

---

[1]    In pursuit of a decision that is not only objective in fact, but objective by all appearances, the Court has given thoughtful consideration to the appropriate way to identify the respective races. Unfortunately, labels are inherently pregnant of connotation, and generally inadequate in their ability to characterize an entire group of people whose cultural, physical, and progenital commonality are a spectrum of attributes rather than a discrete set of qualities. The United States Census Bureau uses both the terms "black" and "African-American." Although the phrase "African-American" is likely under-representative for its failure to encompass fully the heritage of each member in the relevant community, it is seemingly preferable to the increasingly arcane pairing of "black and white," which generally fails to be either accurate or discreet. The Court will therefore predominately employ the phrase African-American going forward.

2

with the particular geographic and historical realities of this County, unlawfully and institutionally inhibit a community of voters in Charleston County from equal access to the electoral process.   The United States Supreme Court has made it clear that the "essence of a § 2 claim is that a certain electoral law, practice or structure interacts with social and historical conditions to cause inequality in the opportunities enjoyed by black and white voters to elect preferred representatives."  *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).  In other words, a violation of Section 2 may arise from the structure of the electoral process itself plus the effects of *past* discrimination without regard to any *present* discriminatory intent.  This case is one such instance.

Undoubtedly there are bigots among us, and while their stories uncomfortably texture the four corners of the Court's decision, this Order is little about them. If the trial on the merits demonstrated anything, it is that Charleston County can celebrate a rich legacy of individuals selflessly working towards a true community among its many races.  Notwithstanding, the current at-large system, as it exists in a county of this size, unlawfully exacerbates the disadvantaged political posture inherited by generations of African-Americans through centuries of institutional discrimination.

## INTRODUCTION

**Procedural History**

The United States brought this action on January 17, 2001.[2]  The United States did not

---

[2]        As amended in 1982, Section 2 of the Voting Rights Act of 1965, provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which *results in* a denial or abridgement of the right of any citizen of

3

allege a violation of Section 2's intent standard.[3]   Private plaintiffs, who are four citizens registered to vote in Charleston County elections, filed their suit on February 28, 2001, alleging that Charleston County's at-large method of election violates the results and intent standards of Section 2.   The Court consolidated the two cases on April 6, 2001.

On March 5, 2002, the United States moved for partial summary judgment as to the three preconditions set forth by the United States Supreme Court in *Thornburg v. Gingles*, 478 U.S. 30 (1986).  On March 29, 2002, the United States also moved to enjoin the County from holding elections for open seats on the Charleston County Council until a proper remedy could be implemented under Section 2.  On April 1, 2002, the private Plaintiffs also filed motions for a

_____

the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the [jurisdiction] *are not equally open to participation by members of a class* [*protected by Section 2(a)*] *in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.* The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered:  Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973 (emphasis added).

[3]     Section 2 contains both a "results" standard and a prohibition against intentional racial discrimination in voting.  Claims of intentional discrimination under Section 2 are assessed according to the standards applied to constitutional claims of intentional racial discrimination in voting.  *See Garza v. County of Los Angeles*, 918 F.2d 763, 766 (9th Cir. 1990) ("[T]he Voting Rights Act can be violated by both intentional discrimination in the drawing of district lines and facially neutral apportionment schemes that have the effect of diluting minority votes.").

4

partial summary judgment on the *Gingles* preconditions and for a preliminary injunction. On April 2, 2002, the Defendants moved for summary judgment on the third *Gingles* precondition and on the totality of circumstances.

Magistrate Judge Robert S. Carr heard oral argument on those motions on April 17, 2002. In a written Report and Recommendation dated April 26, 2002, Magistrate Judge Carr recommended that (1) the United States' Motion for Partial Summary Judgment on the *Gingles* preconditions be granted, (2) the Defendants' Motion for Partial Summary Judgment on the totality of the circumstances be denied, and (3) the United States' Motion for Preliminary Injunction be denied.

Defendants objected only to Magistrate Judge Carr's recommendation that partial summary judgment be granted the United States as to the third *Gingles* precondition. They did not object to the other recommendations, including those related to the first two *Gingles* preconditions or that an untimely affidavit filed by one of Defendants' expert witness, Dr. Ronald Weber, be stricken from these proceedings. The United States objected only to that portion of Magistrate Judge Carr's Report and Recommendation that concluded that the United States did not meet its burden of demonstrating that a preliminary injunction would serve the public interest.

On May 24, 2002, the Court denied the United States' Motion for Preliminary Injunction. In an Order dated July 10, 2002, the Court adopted Magistrate Judge Carr's Report and Recommendation *in toto* granting Plaintiffs' motion for summary judgment on the three *Gingles* preconditions. Both the Court's Order, dated July 10, 2002, granting Plaintiffs' motion for partial summary judgment and the Magistrate Judge's Report are incorporated herein by specific

5

reference.

The trial in this case commenced on July 15, 2002, and concluded on August 16, 2002. On September 18, 2002 the Court denied the United States' renewed motion for preliminary injunction against the November 5, 2002 general election for positions on the Charleston County Council.

**Jurisdiction and Standing**

The Court has subject matter jurisdiction over this action pursuant to 42 U.S.C. § 1973j, and 28 U.S.C. §§ 1331 and 1345. The voting rights claims advanced by the United States in this action are premised solely upon Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973.

Pursuant to 42 U.S.C. § 1973j(d), "[w]henever any person has engaged . . . in any act or practice prohibited by [Section 2] . . . the Attorney General may institute for the United States, or in the name of the United States, an action for preventive relief, including an application for a temporary or permanent injunction . . . or other order." Thus, the United States has standing to challenge Charleston County's at-large method of election for its County Council to protect the voting rights of the County's African-American citizens.[4]

Private Plaintiffs also have standing to pursue their claims. *See Wilson v. Minor,* 220 F.3d 1297, 1303 n.11 (11th Cir. 2000) (citing *United States v. Hays*, 515 U.S. 737, 742 (1995) and stating "the essential point remains that in order to have standing one must reside in the area directly affected by the allegedly illegal voting scheme").

---

[4]     It is important to the analysis to remember that the Voting Rights Act does not require nor allow the Court to examine the merits or demerits of at-large voting versus single-member districts except as to how they may effect minority voting rights.

6

**DISCUSSION: FINDINGS OF FACT and CONCLUSIONS OF LAW**

**I.    Factual Background**

**Demographic Information and Statistical Background**

Charleston County is the third most populous of South Carolina's 46 counties and has the second highest total number of African American residents.  (U.S. Ex. 106.)  According to the 2000 Census of Population, Charleston County has a total population of 309,969.  (U.S. Ex. 107.)  Of that total, 188,542 (60.8%) persons are white and 106,337 (34.3%) are African American; 15,090 (4.9%) are of other racial/ethnic descent.  (Id.)[5]  Charleston County's voting age population is 236,395, of whom 153,250 (64.8%) are white, 72,287 (30.6%) are African American, and 10,858 (4.6%) are of other racial/ethnic descent.  (Id.)

According to the South Carolina Election Commission, as of November 2000: (1) 177,279 persons were registered to vote in Charleston County, 122,557 (69.1%) of whom were white and 54,722 (30.9%) of whom were nonwhite; and (2) 114,166 persons voted in the November 2000 general election, 82,395 (72.2%) of whom were white, and 31,771 (27.8%) of whom were nonwhite.  (U.S. Ex. 44I.)  African-American voters participate at a lower rate in elections than white voters in Charleston County.  (Joint Ex. 2A at Tables 4-5; U.S. Ex. 14 at Table 4; U.S. Ex. 15 at Table 1.)

Charleston County encompasses a geographical area of 919 square miles, a significant portion of which is water, and includes the incorporated municipalities of Awendaw, Charleston,

---

[5]    The figures for the white and African-American total population and voting age population in this paragraph do not include Hispanics, who may be of any race, and people who are of two or more races.  The persons in the other category include those of Hispanic, American Indian or Alaska Native, Asian, Hawaiian or Pacific Islander, and other descent, and persons of two or more races.

Folly Beach, Hollywood, Isle of Palms, James Island,[6] Town of Kiawah, Lincolnville, McClellanville, Meggett, Mount Pleasant, North Charleston, Ravenel, Town of Seabrook and Sullivan's Island.

## II.     Method of Election for County Council

The Charleston County Council governs Charleston County. (U.S. Am. Comp. ¶ 3; Am. Answer ¶ 3.) It is composed of nine members elected at-large in partisan elections to four-year, staggered terms. (U.S. Am. Comp. ¶¶ 4, 6; Am. Answer ¶¶ 3, 5.) Council members qualify from four residency districts in the following fashion: three members reside in the City of Charleston, three members reside in the area between the Ashley and Cooper rivers that is not in the City of Charleston, two members reside in the area west of the Ashley River that is not in the City of Charleston, and one member resides in the area east of the Cooper River. (U.S. Am. Comp. ¶ 6; Am. Answer ¶ 5.)

The County's at-large method of election was created in 1969, and precleared by the United States Attorney General under Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c.[7]

---

[6]     James Island's status as a town is presently in litigation.

[7]     The Attorney General granted administrative preclearance to Charleston County's at-large method of election some four years after Section 5 was first enacted and before any at-large elections were held under that 1969 law. On its face, Section 5 of the Voting Rights Act specifically provides that a subsequent civil action can be filed challenging a voting standard, practice or procedure that has been precleared under Section 5: "Neither an affirmative indication by the Attorney General that no objection will be made, nor the Attorney General's failure to object, nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure." 42 U.S.C. § 1973c. Thus, the United States may bring a Section 2 claim against a precleared voting practice alleging discriminatory intent or result. *See Reno v. Bossier Parish School Bd.*, 528 U.S. 320, 334 (2000). However, in this action, the United States, unlike the private Plaintiffs, does not allege that the at-large method of election was enacted in 1969 with a discriminatory intent.

8

In 1989, Charleston County held a referendum on a proposal to switch from at-large to single-member districts for the County Council.  Supporters of at-large elections prevailed by a margin of 52 to 48 % in a referendum with a turnout of less than 13 %.  The *Evening Post* editorialized that voting in the referendum was polarized along racial lines.  (U.S. Ex. 16 at 24; Transcript of Record at 971 [hereafter "Tr. at __."]).  Moreover, according to the United States' expert, Dr. Theodore Arrington, and the Defendants' expert, Dr. Ronald Weber, voting on the referendum was extremely polarized between white and African American voters:  they agree that at least 98% of African-American voters voted "yes" on the referendum and at least 75% of the white voters voted "no."  (U.S. Ex. 14 at 63-64; Joint Ex. 2C, at Ex. A thereto.)

Since 1970, 41 persons have been elected to the Charleston County Council, three of whom are African American: Lonnie Hamilton III, Marjorie Amos-Frazier, and Timothy Scott.  (U.S. Ex. 30.)   Scott is the only current African-American member of the Charleston County Council.

Charleston County is one of only three South Carolina counties that elects its entire county council at-large.  (U.S. Am. Comp. ¶ 11; Am. Answer ¶ 6.)  The other two counties, Hampton and Jasper, are rural counties with total populations of less than 22,000 residents in each county, and comprised of a close balance of African-American and white citizens.  (U.S. Exs. 78, 106.)  Moreover, of the 35 South Carolina counties in which whites were a majority of the population according to the 2000 Census of Population, only one – Charleston County – continues to elect its entire county council at-large.  (U.S. Ex. 106.)

## III.     General Overview of the Results Standard of Section 2

As amended in 1982, Section 2(a) of the Voting Rights Act prohibits in part any state or

political subdivision from imposing or applying "any standard, practice, or procedure" which "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]"  42 U.S.C. § 1973.

Section 2 prohibits all forms of voting discrimination that "result in the denial of equal access to any phase of the electoral process for minority group members."  S. Rep. No. 97-417 at 30 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 207 (hereinafter "Senate Report").  As amended in 1982, Section 2 requires proof only of a discriminatory result, not of discriminatory intent. *Chisom v. Roemer*, 501 U.S. 380, 394 (1991).[8]  The essence of a Section 2 results-claim is that an "electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).  While the results standard does  not provide an assurance of success at the polls for minority preferred candidates, it does provide an assurance of a fair process. *Johnson v. DeGrandy*, 512 U.S. 997, 1014 (1994).

Thus, Section 2 insures that minority voters are free from any election practice "which operate[s], designedly or otherwise" to deny them the same opportunity to participate in all phases of the political process as other citizens enjoy.  Senate Report at 28.  The critical question, therefore, is "whether the use of a contested electoral practice or structure results in members of a protected group having less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Gingles*, 478

---

[8]    In *Chisom*, the Supreme Court explained that "[u]nder the amended statute, proof of intent is no longer required to prove a Section 2 violation.  Now plaintiffs can prevail under Section 2 by demonstrating that a challenged election practice has resulted in the denial or abridgment of the right to vote based on color or race." *Chisom*, 501 U.S. at 394.

U.S. at 63 (citations omitted). "[A]t-large voting in a multimember political unit," as exists in Charleston County, "may prevent minorities from electing representatives of their choice by diluting their voting strength," in violation of Section 2. *Collins v. City of Norfolk*, 883 F. 2d 1232, 1236 (4th Cir. 1989) (citing *Gingles*, 478 U.S. at 47-48).

In *Gingles*, the Supreme Court established three preconditions that a plaintiff challenging an at-large election system under Section 2 must satisfy. "First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. "Second, the minority group must be able to show that it is politically cohesive." *Id.* at 51. "Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it -- in the absence of special circumstances, such as the minority candidate running unopposed . . . -- usually to defeat the minority's preferred candidate." *Id.*

Satisfaction of the three *Gingles* preconditions is necessary to establish a Section 2 claim, but it alone is not sufficient. *Johnson v. DeGrandy*, 512 U.S. 997, 1011 (1994). The Court must also perform a "totality of circumstances" inquiry. The Supreme Court has looked to the Senate Report accompanying the 1982 extension of the Voting Rights Act for guidance as to the "nature of § 2 violations and [] the proof required to establish these violations." *Gingles*, 478 U.S. at 43. The Senate Report outlines various factors the Court might consider in analyzing a Section 2 claim. The Senate Factors include:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the Democratic process;

2. the extent to which voting in the elections of the state or political

subdivision is racially polarized;

3.      the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4.      if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5.      the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6.      whether political campaigns have been characterized by overt or subtle racial appeals;

7.      the extent to which members of the minority group have been elected to public office in the jurisdiction.

Senate Report at 28-29 (footnotes omitted).

The Senate also recognized the following "[a]dditional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation":

• whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group [and]

• whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Id.* at 29 (footnotes omitted).

## IV.     Plaintiffs Have Established the Three *Gingles* Preconditions

As noted, this Court granted partial summary judgment for Plaintiffs on the three *Gingles* preconditions in its Order dated July 10, 2002. Accordingly, the Court reaffirms its findings that (1) the African-American population of Charleston County is sufficiently numerous and

12

geographically compact to constitute a majority in at least one of nine single-member districts in an illustrative plan for Charleston County Council; (2) African-American voters in Charleston County are politically cohesive; and (3) candidates of choice of African-American voters in Charleston County Council contests are usually defeated as a result of white bloc voting.

## V.    The Totality of the Circumstances Inquiry

Establishment of the *Gingles* preconditions presages Section 2 liability. Indeed, "it will be only the *very* unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of the circumstances." *Teague v. Attala County*, 92 F.3d 283, 293 (5th Cir. 1996) (citation omitted) (emphasis added).[9]

Plaintiffs need not prove any particular number of Senate factors or that a majority of them point "one way or the other." *Gingles*, 478 U.S. at 45 (citing Senate Report at 29). Nor must Plaintiffs demonstrate that white voters "demonstrate an unbending or unalterable hostility to whoever may be the minority group's representative of choice, but whether, as a practical matter, the usual result of the bloc voting that exists is the defeat of the minority-preferred candidate." *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1123 (3d Cir.

---

[9]    *Accord Vecinos de Barrio Uno v. City of Holyoke*, 72 F.3d 973, 983 (1st Cir. 1995); *see Sanchez v. State of Colo.*, 97 F.3d 1303, 1310 (10th Cir. 1996) (noting that establishment of *Gingles* preconditions "creates the inference the challenged practice is discriminatory"); *Harvell v. Blytheville Sch. Dist. No. 5*, 71 F.3d 1382, 1390 (8th Cir. 1995) (en banc) ("Satisfaction of the necessary *Gingles* preconditions carries a plaintiff a long way towards showing a Section 2 violation"); *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1116 (3d Cir. 1993) (holding that "it would be a highly unusual case in which a plaintiff successfully proved the existence of the three *Gingles* factors and still failed to establish a violation"); *cf. DeGrandy*, 512 U.S. at 1012 n.10 (noting that Section 2 challenges to multimember districts, as is the case here, are likely to be easier plaintiffs' cases than challenges to electoral practices in single-member districts).

1993).

The Court will begin its totality of the circumstances consideration with the two Senate factors identified by the Supreme Court as most important: (1) the "extent to which minority group members have been elected to public office in the jurisdiction" and (2) the "extent to which voting in the elections of the state or political subdivision is racially polarized." *Gingles*, 478 U.S. at 48 n.15 (citing Senate Report at 28-29, U.S.C.C.A.N.1982, p. 206). If those factors are present, the other factors "are supportive of, but not essential to, a minority voter's claim." *Id.*

A.      **The Extent of Racially Polarized Voting**

The Court will first consider the extent to which voting in Charleston County elections is racially polarized. The Supreme Court defines racially polarized voting as a "'consistent relationship between [the] race of the voter and the way in which the voter votes,' or to put it differently, where 'black voters and white voters vote differently.'" *Gingles*, 478 U.S. at 53 n.21 (internal citations omitted); *see also Sanchez v. State of Colo.*, 97 F.3d 1303, 1312 (10th Cir. 1996). Dr. Theodore Arrington, expert for the United States, found that out of 31 contested, County-Council elections studied from 1984 to 2000, voting was racially polarized 29 times (94%). (U.S. Ex. 14 at Table 13.) The findings of Defendants' own expert, Dr. Ronald Weber, also confirm that voting in Charleston County Council elections is severely and characteristically polarized along racial lines. In 25 of the 33 contested general elections, from 1988 to 2000, African-American and white voters were polarized (75.8%).[10] (Joint Ex. 2B ¶ 7.) This pattern

---

[10]      A number of discrepancies exist in Dr. Weber's various reports concerning polarization in Charleston County Council elections. Importantly, however, Dr. Weber has universally found severe and legally significant voting polarization, notwithstanding any

of racially polarized voting is perhaps most dramatically demonstrated by Dr. Weber's findings that, in general election contests for Charleston County Council with at least one African-American candidate, there was polarization between African-American and white voters 100% of the time.[11]  (Id. at Figures 5-6.)  Even in general election contests for Charleston County Council involving no African-American candidates, there was polarization between African-American and white voters 87.5% of the time.  (Id.)

It cannot be overstated that such polarization has resulted in a legally significant quantum of defeats for minority-preferred candidates, as previously concluded by the Court in its Order dated July 10, 2002. (See also Joint Ex. 2A ¶ 53; Joint Ex. 2B at Figure 7.)  It is this consistent defeat at the polls that makes such egregious polarization ultimately relevant.  *See Gingles,* 478 U.S. at 56.  "[W]here minority and majority voters consistently prefer different candidates, the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters."  *Id.* at 48.

The Court concludes that this evidence of significant and pervasive polarization militates strongly in favor of finding a Section 2 violation.

_____

conclusions he may have concerning the *cause* of such polarization.  Ultimately, the Court is particularly compelled by the careful report prepared by Dr. Arrington.

[11]     The Fourth Circuit, in *dicta*, has suggested that contests involving African-American candidates may in fact be more probative of *racial polarization* than elections without an African-American candidate.  *Lewis v. Alamance County*, 99 F.3d 600, 610 n.8 (4th Cir. 1996).  The Fourth Circuit, however, has clearly cautioned that such elections cannot necessarily be afforded greater weight when considering whether "because of that polarization, minority-preferred candidates are *usually* defeated."  *Id.*  The holding in *Alamance* is predicated on the obvious understanding that white candidates may in fact represent the candidate of choice of the minority community.   To that end, this Court has remained guarded, and only focuses particularly on elections involving   African-American candidates for the issue of *voting polarization*.

### B.     The Extent to Which African-American Persons Have Been Elected to Public Office

The second most important Senate factor is the extent to which African-American persons have been elected to public office in the jurisdiction.  As discussed above, of the 41 persons elected to the Charleston County Council since 1970,[12] just three (7.41%) have been African American: Lonnie Hamilton III, Marjorie Amos-Frazier[13] and Timothy Scott.  (U.S. Ex.

_____

[12]  No African Americans were elected to the Charleston County Council before 1970.

[13]  It should be noted that Hamilton won 6 elections between 1974 and 1990.  Amos-Frazier won in both 1974 and 1978.  Notwithstanding the tenure of both Hamilton and  Amos-Frazier, their successes remain the exception rather than the rule. First, as readily conceded by Dr. Weber, courts have found recent elections to be the most probative.  (Joint Ex. 2A at 9-10); *see also Ruiz v. City of Santa Maria*, 160 F.3d 543, 555 (9th Cir. 1998); *Uno v. City of Holyoke*, 72 F.3d 973, 990 (1st Cir. 1995); *Meek v. Metro. Dade County, Fla.*, 985 F.2d 1471, 1482-83 (11th Cir. 1993).  The question of vote dilution must be measured in the present, not the past, tense.   *Uno*, 72 F.3d at 990.  For example, if there was no racially polarized voting in a jurisdiction since 1984, the existence of racially polarized voting in the 1970s would not be relevant.  Indeed, Dr. Weber specifically declined to analyze pre-1988 elections in his reports because of their negligible relevance. (Joint Ex. 2A at 9-10.)  Accordingly, whatever successes Hamilton and  Amos-Frazier had in the 1970s and 1980s is of marginal relevance to whether African Americans *presently* enjoy equal access to the electoral process.

Moreover, the Court received compelling evidence that the electoral successes of Hamilton and  Amos-Frazier, notwithstanding the obvious and remarkable qualities of the candidates themselves, were due, in large measure, to the coalition building that was characteristic of Democratic Party politics in Charleston County throughout the 1970's. (See, e.g., Tr. at 679-83.)

Defendants contend that it is actually the effectiveness of these biracial coalitions in the1970s that demonstrates that African-American candidates could win today if only they sought to build similar relationships.  Specifically, Defendants point to the effective coalition between African-American Democrat  Amos-Frazier and the white Democrat Jimmy Stuckey. (Tr. at 679-83.) The Record suggests otherwise.  The Court received testimony from both Amos-Frazier and Judge Bernard Fielding that the political environment of today is significantly different from that of the 1970s.  (See Tr. at 133 (Fielding); 659-60; 660-65 (Amos-Frazier).) Amos-Frazier testified that her situation in the 1970s was unique in that Bill Ackerman, a white lawyer and politician, paid her to run his Charleston mayoral campaign in 1971, paid her to run the Alliance of Concerned Citizens for Better Government thereafter, and then partnered her with Jimmy Stuckey in the 1974 election. (Tr. at 639, 643, 665, 666, 2536.)  Importantly, Amos-Frazier testified that she would not run for County Council today if she was the same age as she

30.)  Of those three, Timothy Scott is emphatically not the candidate of choice of the county's African-American voters.[14]  Although independently the elections of Hamilton, Scott, and Amos-Frazier are important stories of electoral success for minority candidates, they nonetheless represent a facially inadequate quantum of endogenous success among African-American candidates.

Moreover, in all elections exogenous to the county-council races, African-American candidates have fared no better.  The following represents the entire universe of African-American-candidate electoral success in all other exogenous, at-large elections within the jurisdiction:

- five African-American members of the nine-member Charleston County School Board, elected in the November 1998 General Election.  The expert for the United States, Ted Arrington, agreed that all five of these individuals are African-American-preferred candidates (Tr.at 356).

- County Probate Judge Bernard Fielding, an African-American, who ran countywide as a Democratic candidate in the November 1990 General Election and was elected.

---

was in 1974 because she does not believe she could win, (Tr. at 659-60), expressly stating that she believed that the white community in Charleston County is different today than it was in the 1970s, (Tr. at 660-65).

There is also evidence that contemporary efforts to build biracial coalitions have been undermined by significant "white flight" from the Democratic Party in Charleston County since the 1970s.  (Tr. at 2539.)  Reasons for this flight include the Democratic Party's position on civil rights, (Tr. at 229).

[14]  According to Dr. Weber, Scott has never been preferred by minority voters in any of his three elections to Charleston County Council.  Indeed, according to Dr. Weber, Scott received an estimated 30.7% support from nonwhite voters in a 1995 special election.  Thereafter, Scott's African-American support tumbled.  Just two years later, Scott received an estimated 7.0% support from nonwhite voters in a 1997 special election, and he fared even worse in the 2000 general election, when he received an estimated 2.8% of the votes cast by nonwhite voters.  (Joint Ex. 2A, Ex. E thereto, at 13, 23; Joint Ex. 2C, Ex. A thereto, at 4.)  Scott ran as a Republican.

17

- Hollywood Mayor Herbert Gadson, who is African American.

- Awendaw Mayor William Alston, who is African American.

- Lincolnville Mayor Tyrone Aiken, who is African American.

- Former State Senator and State Representative Herbert Ulysses Fielding, an African American, who ran at large as a Democratic candidate for the South Carolina House of Representatives in 1970 and was elected in that at-large election.

- Charleston City Councilman Louis Waring, an African American, who in 1990 ran at-large as a Democratic candidate for St. Andrews Public Service District Commissioner, and was elected in that special purpose district with a majority white voting age population.

- Mount Pleasant Council member Thomasina Stokes-Marshall, an African American, who ran at-large for and won a seat on the Town Council of Mount Pleasant, a municipality with a nine percent African-American voting age population.

Notably, in Charleston County's entire history, the aforementioned Judge Bernard Fielding, is the only African-American candidate to have ever won a countywide election for any of the seven single-seat offices: probate judge, sheriff, clerk of court, coroner, treasurer, register mesne conveyance and auditor. (Tr. at 101-02, 183-84.) Even still, after his November 1990 election victory to the office of Charleston County Probate Judge, Judge Fielding was not sworn in until the following August of 1991 and only after the South Carolina Supreme Court's unanimous ruling that rejected an election contest by his opponent. (Tr. at 99-101; *see Fielding v. South Carolina Election Comm'n*, 305 S.C. 313 (1991).)[15]

---

[15] Although African-American persons have been elected to the South Carolina House and Senate, the City of Charleston City Council, and other local offices, virtually all were elected from single-member, majority-African-American voting districts. Indeed, none of the statistical experts analyzed these exogenous elections.

Evidence of African-American candidate success in school board elections is also of dubious consequence. As stated, following the November 1998 General Election, the Charleston County School Board was comprised of five African-American trustees and four white trustees.[16] However, the Record demonstrates that the success of some African-American, school-board candidates is attributable to special circumstances unique to the school board elections. To wit, two of the five current African-American members were elected in contests where there were fewer white candidates than seats contested: in 1998, Oliver Addison was elected in a contest with no white candidates, and in 2000, Hillary Douglas was elected in a two-seat contest where there were only two white candidates on the ballot, one of which withdrew publicly one month before the election. (U.S. Ex. 23; Tr. at 323-24, 413, 578.) There is sufficient evidence to conclude that two of the other African-American school board members (Lewis, Ketchen-Simpkins) ran against multiple white opponents and won because the white vote was split among the white candidates. (U.S. Ex. 23, Tr. at 333-34, 413). Indeed, Douglas's contest – a two seat contest with only one white candidate that had not withdrawn – was the only black-white

---

[16]     Because the School Board elections are non-partisan, Defendants have attempted to use them as a "control" for "race" in identifying the cause of polarization in Charleston County voting. They contend that the success of African-American candidates in the non-partisan school board elections demonstrates that partisanship, and not race, explains the County's polarized voting patterns, because without the partisan "cues" of the county council elections African Americans experience greater success in school board elections. However, Dr. Arrington testified that polarization in school board races, in fact, closely mirrors that found in the county council elections, (Tr. at 412 (testifying that whites had never "favored" an African-American candidate and vice versa, and describing the voting as being along "racial lines")), and to the extent such polarization results in fewer defeats of minority-preferred candidates than in county council elections, the special circumstances discussed *infra* adequately account for such discrepancies. (But see Joint Ex. 2B at Figure 15 (finding, by Dr. Weber, that polarization occurred in School Board races only 12% of the time.)

It should also be noted that as a result of the 2002 elections the School Board has only one African-American member.

School Board contest from 1990 to the present where an African-American candidate would have been elected if only white voters had voted.[17] (U.S. Exs. 23 and 25.) Dr. Weber found that in some of the school board races, African-American voters had participated in single-shot voting.[18] (Tr. at 2129, 2136.) He also found that African-American school board candidates had won because the white vote was split among several white candidates, a phenomenon that does not occur in County Council races. (Tr. at 2140, 2142, 2145-46.) These special circumstances explain the contemporary and inordinate African American-candidate success that is out of balance with the characteristically poor results for African American candidates in all other

_____

[17]    Defendants' expert Dr. Moore testified that the election of five African Americans to the County's nine member school board demonstrates the ability of the African American community to impact the electoral process and select candidates. (Tr. at 2890.) On cross-examination, however, Dr. Moore conceded that comparing School Board elections and County Council elections are like comparing "apples and oranges," (Tr. at 2988), and that he could not know how much significance, if any, to attach in this case to school board elections without analyzing the election data, which he did not do, (Tr. at 2994-96.)

[18]    The United States Supreme Court has recognized the following description of single-shot ("bullet") voting:

> "'Consider [a] town of 600 whites and 400 blacks with an at-large election to choose four council members. Each voter is able to cast four votes. Suppose there are eight white candidates, with the votes of the whites split among them approximately equally, and one black candidate, with all the blacks voting for him and no one else. The result is that each white candidate receives about 300 votes and the black candidate receives 400 votes. The black has probably won a seat. This technique is called single-shot voting. Single-shot voting enables a minority group to win some at-large seats if it concentrates its vote behind a limited number of candidates and if the vote of the majority is divided among a number of candidates.'"

*Gingles*, 478 U.S. at 39 n.5 (quoting *City of Rome v. United States*, 446 U.S. 156, 184 n.19 (1980), (quoting United States Commission on Civil Rights, The Voting Rights Act: Ten Years After, pp. 206-07 (1975))).

jurisdictional elections.

In sum, the United States has demonstrated that there has been only a disproportionately small number of African American persons ever elected to the Charleston County Council under the at-large method of election and throughout the jurisdiction. While the individual success of these African-American candidates in Charleston County is of immeasurable consequence to African Americans in Charleston County and the community at-large, they are an unfortunate and paltry offering for purposes of the Court's Section 2 inquiry.

Reinforcing the Court's consideration of the *Gingles* preconditions, the two most important Senate factors–the extent of racially polarized voting and the success of minority candidates in the jurisdiction–both weigh markedly in favor of a finding that African Americans suffer unequal access to the electoral process.

Although "supportive of, but not essential to, a minority voter's claim," *Gingles*, 478 U.S. at 48 n.15, the Court considers the following additional Senate Factors.

C.    **The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process**.

The Court is next concerned with the extent to which African Americans in Charleston County "bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process." S. Rep. No. 97-417, 97th Cong. 2d Sess. 28, 29 (1992). This factor is satisfied when the plaintiffs can show (1) "disproportionate educational, employment, income level and living conditions arising from past discrimination" and (2) a depressed level of minority participation in politics. *Id.* at 29 & n.114. Importantly, Plaintiffs do not have to prove a causal nexus between the two:

> The Courts have recognized that disproportionate educational employment, income level and living conditions arising from past discrimination tend to depress minority political participation. Where these conditions are shown, and where the level of black participation in politics is depressed, plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation.

*Id*. (citations omitted); *see also Teague v. Attala County, Miss.*, 92 F.3d 283, 294 (5th Cir. 1996); *League of United Latin Am. Citizens v. Clements*, 999 F.2d 831, 866 (5th Cir. 1993). The United States Supreme Court has recognized that inequalities in education, employment, income level and living conditions that arise from past racial discrimination have a deleterious tendency to hinder minority political participation. *White v. Regester*, 412 U.S. 755, 768 (1973).

### 1. Disproportionate education, employment, income level, and living conditions arising from past discrimination.

It is plain that African Americans have suffered a pronounced and protracted history of past discrimination. The Court briefly recounts particular indiscretions not for their emotive features but for their necessary place in the totality of the inquiry required by Section 2. The focus, however, will ultimately remain on the present disproportionality in education, employment, income, and living conditions between African Americans and whites resulting from such discrimination and whether African Americans participate politically at depressed levels.

During the first half of the twentieth century, African-American citizens in Charleston, as in other areas of South Carolina, were subject to segregation laws which had a discriminatory effect on most aspects of their lives. (U.S. Ex. 11 at 1; U.S. Ex. 16 at 5, 7-8; Tr. at 928.) Among the public institutions most important to future participation in the political process is education. Charleston County's segregated facilities for African Americans were routinely

22

inferior and the distribution of resources were greatly disparate.  Per-pupil expenditures for public education, calculated separately for both African-American and white schools, provide a measure of discrimination in school quality under segregation that is widely accepted by historians.  (Tr. at 928-30.)  In 1915, Charleston County schools spent five times as much for white pupils as for African Americans.  (U.S. Ex. 16 at 6, quoting Louis Harlan, *Separate and Unequal: Public School Campaigns and Racism in the Southern Seaboard States, 1901-1915* 185 (1968); Tr. at 929.)  In the 1930s, expenditures for white students were four times those for African-American students; by the end of the 1940s, the ratio was roughly two to one in favor of white pupils.  (U.S. Ex. 16 at 44, App.)  Even as late as the 1958-1959 school year, per-pupil expenditures favored whites by a ratio of 1.3 to one.  (Id; Tr. at 929.)  These deficiencies have greatly diminished the educational capital inherited by the present generation of African Americans.

As in so many other communities, racial change did not come quickly or easily to Charleston County.  When the United States Supreme Court decided *Brown v. Board of Education* in 1954, the Charleston *News and Courier* editorialized that it would lead to "the most radical upheaval since Reconstruction."  (Quoted in Priv. Pls.' Ex. 1 at 16.)  In its aftermath state and local officials made plans to maintain racial segregation by every legal means, and prominent white leaders organized local Citizens Councils to promote the unity of the white community behind the cause of segregation.  Charleston had an active Citizens Council chapter in the 1950s under the leadership of a person subsequently elected to the Charleston County Council.  (Priv. Pls.' Ex. 1 at 16, 41; Tr. at 1147, 1158-59, 1195, 2915.)

Prior to the enactment of Title 2 of the 1964 Civil Rights Act, facilities open to the

public, such as restaurants, doctors' offices, buses, movie theaters, parks and beaches, were segregated along racial lines. (Tr. at 1285-86, 1287, 1432-34, 1921.)  As described by former Charleston County Probate Judge Bernard Fielding, the county during the period before the passage of the 1964 Civil Rights Act was "totally segregated." (Tr. at 88-89.)

Desegregation came to Charleston County, as to the rest of the South, largely as a result of federal court orders.  Initially, however, state and local officials sometimes closed facilities rather than eliminate racial segregation.  In 1934, an enactment of the South Carolina Legislature which applied only to Charleston County made it a crime for African Americans and whites to use the same recreational facilities.  When African-American citizens filed a lawsuit challenging the racial segregation of facilities at Edisto Beach State Park in Charleston County, the State Commission of Forestry closed the park to all citizens.  *Clark v. Flory*, 141 F. Supp. 248 (E.D.S.C. 1956).  The park was closed until 1966.  (Priv. Pls.' Ex. 1 at 17; Tr. at 708.)  The law was not repealed until 1977.  1977 S.C. Acts 306.

Over time, however, officials began to accede to court orders, rather than eliminate public services.  The successful desegregation of Charleston's municipal golf course in 1961, for example, resulted from the decision of city officials to comply with a federal court order in *Cummings v. City of Charleston*, 288 F.2d 817 (4th Cir. 1961).

In 1961, the South Carolina Supreme Court upheld the constitutionality of the state's trespass-after-notice law and affirmed the convictions of 24 African-American citizens who refused to leave the lunch counter at the S.H. Kress Store in Charleston County.  *City of Charleston v. Mitchell*, 239 S.C. 376 (1961).  The United States Supreme Court reversed the decision by the South Carolina Supreme Court in *City of Charleston v. Mitchell*, 239 S.C. 376

24

(1961), on the grounds that enforcement of the state's anti-trespass law had taken place in such a way as to violate the constitutional rights of the African-American citizens prosecuted in the City of Charleston. *Mitchell v. City of Charleston*, 378 U.S. 347, 349 (1964).

Racially discriminatory employment practices, in the private and public sectors, further disadvantaged African Americans economically. (Tr. at 930-32.)   Before civil rights demonstrations took place in the City of Charleston in 1963, virtually all business establishments in Charleston County were racially segregated and did not provide equal pay for equal work for all employees.  (U.S. Ex. 11 at 7; Tr. at 635-36.)  By July 4, 1963, over 500 African-American civil rights demonstrators had been arrested; 229 of them had already been tried and convicted. (Priv. Pls.' Ex. 1 at 18-19.)  As a result of demonstrations, some business establishments in downtown Charleston agreed to serve customers of both races on an equal basis.  (U.S. Ex. 11 at 7.)  Substantial desegregation throughout Charleston County awaited implementation of the 1964 Civil Rights Act.

Until August 1963, the school system of District 20 in Charleston County was completely segregated by race.[19]   *Brown v. School District No. 20*, 226 F. Supp. 819, 826 (E.D.S.C. 1963); (Tr. at 90, 813, 1359-61, 1429.)  In August, 1963, a federal court ordered the admission of eleven African-American students to previously all-white schools in Charleston and enjoined the local school board from refusing admission, assignment, or transfer of any other African-American child, on the basis of race or color, to attend any public school operated by the school district. *Brown*, 226 F. Supp. at 827.

---

[19]     The parent/teacher associations remained racially segregated until the late 1960s. (Tr. at 558, 1359-61.)

Rather than send their children to racially integrated public schools, many white parents chose to have them attend private schools, some of which were organized in the aftermath of public school desegregation.  (Tr. at 936-37; U.S. Ex. 16 at 13-14.)  The then-President of a local college and later a member of the state legislature, helped found an all-white preparatory school at the college, resisted desegregation of the college itself, and gave public speeches opposing racial integration.  (Priv. Pls.' Ex. 1 at 43.)   Financial assistance to parents enrolling their children in private schools was provided in some instances through the state's tuition grant program.  (Priv. Pls.' Ex. 1 at 19.)  As late as 1966, only 185 African-American students were attending desegregated schools in Charleston County.  (U.S. Ex. 16 at 13-14; Priv. Pls.' Ex. 1 at 19, 43-44.)

The Charleston County Bar Association was not open to black attorneys until the late 1960s.  (Tr. at 87, 89.)  As late as 1972, the women's section of the Charleston County Jail was segregated.  (Tr. at 650.)

The discriminatory impact of Charleston County's system of racial segregation is reflected in census data throughout the 20th century.  According to the 1950 Census of Population, the median income for African-American families in Charleston County was $672, roughly one third of the median income for white families ($2,007).  (Priv. Pls.' Ex. 1 at 12.) The percentage of non-white unemployed (13.9 % for males, 10.8 % for females) was far higher than among whites, where only 4.4 % of males and 2.7 % of females were listed as unemployed. (Id.)  Only 3 % of white households had no running water, compared with 27.5 % of non-white households.  (Id.)  Among white households, only 12.8 % had no indoor toilets, as compared with 73 % of non-white households.  (Id.)

26

This pattern of socio-economic disparity has continued to characterize Charleston County during the latter part of the 20th Century. (Tr. at 933, 1182-84.)  According to the 1980 Census, median income for African-American families ($10,907) was still only half that of white families ($20,400) in Charleston County, and 32.2 % of African-American families lived below the poverty level, as compared with only 6.1 % of white families.  Unemployment figures reflected the same sort of disparities:  10.9 % of African-Americans but only 3.7 % of whites were unemployed.  (Priv. Pls.' Ex. 1 at 13.)

According to the 1990 Census, which was the most recently available socio-economic census data at the time of trial, socio-economic disparities continue to divide white and African-American residents of Charleston County.[20]  Such differences, as shown in the following table, are dramatic:

**Comparison of Socio-Economic Status of Blacks and Whites
in Charleston County by 1990 Census
(income data for 1989)**

| Socio-Economic Indicator | Whites | Blacks |
|---|---|---|
| **Education:** | | |
| Percent completed less than 5th grade | 1.0% | 6.6% |
| Percent high school graduate | 83.6% | 57.6% |
| Percent completed some college | 58.0% | 30.1% |
| Percent completed bachelor's degree | 28.5% | 8.8% |

---

[20]    Data from the prior decennial census is presumed accurate unless contradicted by clear, cogent, and convincing evidence.  *Johnson v. De Soto County Bd. of Comm'rs*, 204 F.3d 1335, 1341 (11th Cir. 2000); *Valdespino v. Alamo Heights Ind. Sch. Dist.*, 168 F.3d 848, 853 (5th Cir. 1999).

| Income and employment: | | |
|---|---|---|
| Percent unemployed | 3.2% | 9.8% |
| Median family income | $38,052 | $18,603 |
| Per capita income | $16,339 | $7,106 |
| Percent persons below poverty level | 7.9% | 34.2% |
| Percent families below poverty level | 5.0% | 31.3% |
| Percent persons below 125% of poverty level | 10.6% | 41.1% |
| Percent persons below 200% of poverty level | 21.3% | 60.3% |
| Percent persons with public assistance income | 2.3% | 16.9% |
| **Nativity** | | |
| Percent born in South Carolina | 47.7% | 86.1% |
| Percent born in other southern states | 24.5% | 6.8% |
| Total percent born in the South | 72.2% | 92.9% |

(U.S. Ex. 68D.)  This socio-economic evidence is uncontroverted.  (See, e.g., Tr. at 2168-69.)[21]

─────────────

[21]    After this case was tried, much of the relevant 2000 Census data relating to socio-economic disparities was released.  Plaintiffs have requested that the Court take judicial notice of this 2000 socio-economic data.  The 2000 Census data demonstrates that the socio-economic differences between African Americans and whites in Charleston County have persisted.  However, such evidence was unavailable for full adversarial treatment at trial and, therefore, will be infrequently employed.

**Comparison of Socio-Economic Status of Blacks and Whites
in Charleston County by 2000 Census
(income data for 1999)**

| Socio-Economic Indicator | Whites | Blacks |
|---|---|---|
| **Education:** | | |
| Percent high school graduate | 89.4% | 65.3% |
| Percent completed some college | 65.8.0% | 35.3% |
| Percent completed bachelor's degree | 40.2% | 10.7% |

28

The depressed socio-economic status of African-American citizens of the County compared to white citizens is a legacy of the prolonged history of discrimination by Charleston County and South Carolina. (See U.S. Ex. 16 at 40-43; Tr. at 932-34, 1182-84.)[22] Significantly, Defendants' expert, Dr. William V. Moore, explicitly recognized, in his report and at trial, the causal relationship between past discrimination and present socio-economic levels: "African Americans suffered disproportionately under the old system, and *it does impact on their current socio-economic status in Charleston County*, in the State of South Carolina, and in the nation as a whole." (Defs.' Ex. 14(A) at 39 (emphasis added); Tr. at 2979.) Similarly, the United States' expert, Dr. Dan Carter, testified that Charleston County's history of official discrimination is a "heavy hand" that continues to impact African-American socio-economic status. (Tr. at 931-35, 981-82.)

| Income and employment: | | |
|---|---|---|
| Percent unemployed | 3.9% | 10.9% |
| Median family income | $60,195 | $26,703 |
| Per capita income | $26,956 | $11,787 |
| Percent persons below poverty level | 8.6% | 29.9% |
| Percent families below poverty level | 4.2% | 27.8% |
| **Nativity** | | |
| Percent born in South Carolina | 45.7% | 84.2% |
| Percent born in other southern states | 24.1% | 6.8% |
| Total percent born in the South | 69.8% | 91.0% |

[22]     According to 1990 Census, 86.1% of the African-American residents of Charleston County were born in South Carolina. (U.S. Ex. 68D.)

Anecdotally, Charleston County Grants Administrator Evelyn DeLaine-Hart testified concerning the link between official discrimination and current socio-economic disparities between African Americans and whites in Charleston County. DeLaine-Hart testified that it is difficult to break out of the cycle of poverty because of problems that poor people encounter in areas such as education, child care, transportation, and health. Furthermore, she testified that she has observed poverty within families spanning generations, and that current socio-economic differences suffered by African-American people today are caused in part by past discrimination. (Tr. at 2655-58.)

The Court concludes that African Americans in Charleston County suffer disproportionally to white persons in education, employment, income level, and living conditions as a result of discrimination.[23]

---

[23] In order to view fully the history of discrimination in Charleston County and its effect on present political participation, it is appropriate here, in conjunction with the fifth Senate factor, to also consider the first Senate factor: "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the Democratic process." (Senate Report at 28.) It is undisputed, that there has been a long history of official discrimination touching the right of African Americans to register, to vote, or otherwise to participate in the democratic process. Indeed, the County concedes that there has been a long history of official discrimination in Charleston County, touching the right of African Americans to vote. (See Defs.' Judicial Stip., filed March 5, 2002; Tr. at 2215-16.) By way of example, the South Carolina Constitution of 1895 included a literacy test, a poll tax, disfranchisement for certain enumerated crimes, and long residency requirements. *South Carolina v. Katzenbach*, 383 U.S. 301, 310-11 n.9 (1966). Certainly, such institutional discrimination contemporaneously resulted in significant disparities in the voter registration totals for African-American and white residents of Charleston County. In November 1964, the percentage of South Carolina white persons of voting age who were registered to vote was 75.7%, but only 37.3% of the African-American voting age population was registered to vote, a disparity of 38.4 percentage points. (U.S. Ex. 11 at 5.) In September 1967, according to an estimate published by the United States Commission on Civil Rights, the number of white persons registered to vote in South Carolina equaled 81.7% of the 1960 voting age population, as compared with only 51.2% among African Americans, a disparity of 30.5 percentage points. (U.S. Ex. 11 at 8.) However, unlike the effect

of past discrimination in areas of education, employment, and income, as considered under Senate factor 5, the Court cannot conclude that there remain lingering effects from past discrimination touching the right of African Americans to vote.

At trial, the United States did put forward voluminous testimony concerning what it characterized as a consistent and more recent pattern of white persons acting to intimidate and harass African American voters at the polls during the 1980s and 1990s and even as late as the 2000 general election. So much of the United States's evidence was necessarily anecdotal and has, therefore, made it difficult to properly quantify the effect these incidents in isolation might have had, and continue to have, on the overall participation of African Americans in the electoral and political process. For that reason the Court finds the evidence less probative of whether there in fact exists a pattern of pervasive and *consequential* discrimination at the polls. Sadly, however, the Court agrees that there is significant evidence of intimidation and harassment and by a preponderance of the evidence makes the following findings. The Court, though, without more proof of effect, is loathe to impute the regrettable acts of a few on the County as a whole and ultimately gives such findings only marginal weight in the final analysis.

When she was first appointed to the Charleston County Election Commission in 1991, Carolyn Collins found that poll managers were assigned to the majority-African American precincts who caused confusion, intimidated African-American voters, and had the tendency to be condescending to those voters. (Tr. at 829-30; U.S. Ex. 94.) Collins observed this inappropriate behavior by white managers at majority-black precincts, including the behavior of a particular poll manager at the Joseph Floyd Manor Precinct during the 1996 election. (Tr. at 835-36, 882.) That poll manager had intimidated a number of black voters by his "threatening attitude." (Tr. at 838.) When Collins approached the poll manager and attempted to talk with him concerning his behavior at the polls, he informed her that he did not have to follow her instruction. (Tr. at 840.) Notwithstanding this behavior, that poll manager continued to work at the Joseph Floyd Manor Precinct during the 1996 election. (Tr. at 840.) Indeed, he continues to work as a poll manager at majority-African-American precincts in Charleston County. (Tr. at 847, 884, 888.)

During her service on the Election Commission, Collins also received complaints that poll managers interfered with certain African-American voters' right to receive assistance during the voting process from persons of their choosing. (Tr. at 841-43, 857-58, 864-65.) Section 208 of the Voting Rights Act provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 42 U.S.C. § 1973aa-6. This interference involved white poll managers suggesting that certain African-American voters did not need assistance. (Tr. at 841-44.) Indeed, Collins testified that she had received complaints from African-American voters concerning rude or inappropriate behavior by white poll officials in every election between 1992 and 2002. (Tr. at 845-46, 856; see also 2689.)

At trial, Collins stated that there continue to be problems regarding the treatment of African-American voters by some white poll managers, even though the Election Commission has provided training to poll managers on this subject. (Tr. at 887.)

31

Charleston attorney F. Truett Nettles testified that he has been involved in Charleston County election activities for over 20 years, first as a poll watcher, later as Chairperson of the Charleston County Election Commission, and then again as a poll watcher. (Tr. at 457, 458, 474.) Poll watchers are not employed by the Election Commission. They work on behalf of candidates or political parties. Poll managers, on the other hand, are persons appointed by the Election Commission to conduct the elections. The Election Commission pays poll managers to setup the books, operate the voting machines and count the votes in polling places on election day. (Tr. at 457.)

From 1980 until his appointment as Election Commission chairperson in 1992, Nettles served as a poll watcher assigned on most occasions to predominantly African-American polling sites. (Tr. at 458.) Nettles served on a team of 10-20 lawyers sent to predominantly African-American polling places to help prevent and, when necessary, remedy instances of harassment and intimidation of African-American voters by white poll officials. (Tr. at 458-60.)

Nettles testified that, from 1980 through 2000, "[e]very time, every election we would have controversies in African-American precincts about voter assistance, or just the way voters are treated when they vote." (Tr. at 473.) Several white poll managers -- including a future chairperson of the Election Commission -- were routinely appointed as poll mangers by the Election Commission and assigned to predominantly African-American polling places in Charleston County, where they intimidated and harassed African-American voters. (Tr. at 460-64, 469-71.)

Specifically, Nettles testified that the Election Commission routinely assigned one particularly problematic poll manager to predominantly African-American polling places in different parts of the County during the 1980s and early 1990s. (Id.) At the polls, this poll manager, who is white, routinely approached elderly African-American women seeking to vote and spoke in a loud and condescending voice that called undue attention to these voters and needlessly disrupted the voting process. (Tr. at 460-61, 463.) As described by Nettles, the poll manager would approach these women as soon as they entered the polling place and "make a scene and be real -- speak loudly, and he would put his arm around them and tell them, 'Don't be afraid, everything's going to be all right.' And the voters did not want that special attention. They just wanted to come in and sign up and vote. And it happened repeatedly just to that class of voter." (Tr. at 460-61.) There is testimony that this poll manager's unsolicited interference embarrassed, harassed and intimidated African-American voters. (Tr. at 461.)

This same poll manager's conduct further denied some voters the right to have voting assistance from an assistor of choice. According to uncontradicted testimony, he would approach African-American voters who had properly selected someone to help them vote and, proclaiming loudly, "Oh, you don't need that assistance, I'll help you, I'll take care of you[,]" deny the voter the assistor he or she selected. (Tr. at 462.) The poll manager's conduct toward elderly African-American voters was a "recurring problem." (Tr. at 467, 2460, 2472, 2474.) According to Charleston County Election Commission attorney, Joseph Mendelsohn, the poll manager's behavior at predominantly-African-American precincts was designed to intimidate or cause problems for African-American voters. (Tr. at 2473.) Indeed, this poll manager's ongoing interference with African-American voters in Charleston County polling places

prompted a Charleston County Circuit Court to issue a restraining order against the Election Commission requiring its agents to cease interfering with the voting process. That restraining order arose directly from this poll manager's conduct toward African-American voters. (Tr. at 466; see U.S. Ex. 2.) After his misconduct was brought to the attention of the Election Commission, it had some difficulty removing him from his position as election manager. (Tr. at 2479.)

Nettles also provided additional uncontradicted testimony about intimidating and harassing conduct by other poll managers aimed at African-American voters seeking voting assistance. For instance, Nettles testified that white poll managers in predominantly African-American polling places would "give the third degree" to African-American voters requesting voting assistance by asking questions such as: "Why do you need assistance? Why can't -- can't you read and write? And didn't you just sign in? And you know how to spell your name, why can't you just vote by yourself? And do you really need voter assistance?" (Tr. at 469.)

Poll managers engaged in such conduct included one individual who has recently served as chairperson of the Charleston County Election Commission. Such public and hostile questioning upset and humiliated some African-American voters. (Tr. at 470-71.) This conduct occurred despite the Election Commission's explicit instructions to poll managers that voting assistance should be permitted unimpeded absent affirmative evidence of fraud. (Tr. at 485-86; see Tr. at 2417.) These instructions were based, in part, on the Election Commission attorney's interpretation of federal law regarding the right to voting assistance. (Tr. at 485-86; see Tr. at 2456-58, 2484-85, 2491-92, 2504.)

Conversely, Nettles testified that, based on his observations, white voters needing voting assistance at predominantly African-American polling sites were permitted their assistor of choice without challenge. (Tr. at 471-72, 473.) Moreover, no evidence exists of any instances of harassment, intimidation, or interference directed against white or African-American voters at predominantly white polling places. (Tr. at 473-74.)

African-American voters also endured improper interference from white poll *watchers*, as distinguished from poll managers, who directly confronted some African-American voters requesting assistance with questions such as: "Why do you need assistance, don't you know how to read? You can vote without assistance, you don't qualify." (Tr. at 484-85.) Such poll worker conduct prompted Election Commission action to remedy these ongoing problems. (Id.; U.S. Ex. 106.)

North Charleston Mayor Keith Summey served as Charleston County Election Commission Chairperson from 1978 through 1986, the last four years serving as its Chairperson. (Tr. at 2379, 2380, 2384.) Mayor Summey testified that controversies involving white poll workers and African-American voters were routine during his time on the Election Commission. (Tr. at 2417-2418.) In general, African-American voters complained that white poll managers and poll watchers regularly interfered with those African-American voters' right to receive assistance while voting in predominantly African-American precincts. (Tr. at 2420.) Such activities intimidated some African-American voters, (Tr. at 2419), requiring the Election Commission to remove poll managers and/or poll watchers in predominantly African-American precincts on John's Island, Wadmalaw and other Sea Island precincts, (Tr. at 2420-21.) And

while white poll managers complained that African-American voters sought to vote improperly, Mayor Summey never once found merit to any such allegations. (Tr. at 2418, 2443-44.)

Charleston County Council candidate Rosemarie West testified that in "[a]lmost every election" she observed African-American voters being treated rudely and talked to harshly at the polls. (Tr. at 1346, 1353.)

In the 1990 election, a member of the Charleston County Election Commission and others participated in a Ballot Security Group that sought to prevent African-American voters from seeking assistance in casting their ballots. (Tr. at 1594-96.) One of the other members of the Ballot Security Group was the aforementioned and particularly problematic poll manager assigned by the Election Commission to work in the Hollywood precinct. (Tr. at 1596-97.) He was removed from the Hollywood precinct because of his efforts to deny African-American voters their right to have election assistance from the person of their choice. (Tr. at 1598, 1615.)

Moreover, in the 1980 election, the *News and Courier* reported that some college students, claiming that they were federal poll watchers, intimidated some voters at the Fraser Elementary School, a predominantly African-American precinct in the City of Charleston's East Side. The students threatened to "lock up" voters. (U.S. Ex. 3.)

And while the Defendants suggest that such instances of harassment of and intimidation against African-American voters were attributable solely to partisan politics and not race, the uncontroverted testimony establishes that such conduct never occurred at predominantly white polling places, including those that tended to support Democratic candidates. (Tr. at 529-30 ("My experience is that the bulldogs, we might call them, were sent to the African-American precincts.").) Moreover, to the extent that these intimidating and harassing acts were prompted by partisan zeal, their impact is undeniably racial.

The Court expresses particular concern over two recent episodes of racial discrimination against African-American citizens attempting to participate in the local political process. First, Charleston County Council reduced the salary for the Charleston County Probate Judge in 1991, following the election of the first and only African-American person elected to that position. When he retired in 1990, Probate Judge Gus Pearlman, a white person, was receiving a salary of approximately $85,000 per year. During the period from the retirement of Judge Pearlman to the swearing in of his newly-elected successor, Bernard Fielding, an African-American person, the white Clerk of Court served as interim probate judge and received an $85,000 salary. (Tr. at 193.) At that time Bernard Fielding was completing his 16th year as Associate Probate Judge and earned $68,000 per year. After Judge Fielding was sworn in August 1991, the County Council reduced the salary of the Charleston County Probate Judge by $26,000 to $59,000 per year. Therefore, upon being elected the first and only African-American person to serve as the County's Probate Judge, Judge Fielding's move from associate probate judge to probate judge resulted in his salary being reduced by $8,000. (Tr. at 102-04.) Section 8-21-765(A)(1) of the South Carolina Code established a minimum schedule salary for counties that had at least 200,000 residents. (Tr. at 170.) Thus, South Carolina law did not require Judge Fielding's salary to be reduced to the $59,000 level. This is the same judge whose election was upheld by the South Carolina Supreme Court and who was still forced to seek the Justice Department's intervention to be sworn into office.

2.        **Political Participation**

Having found that African Americans suffer disproportionately in areas of education, employment, and living conditions, the Court next considers whether, as a result of such depressed socio-economic levels, African Americans participate politically at a lower rate than white persons.  Political scientists generally agree that persons with lower socio-economic and educational status tend to participate in the political process at lower rates and thus the history of economic disadvantage continues to have a racially discriminatory effect.  (U.S. Ex. 16 at 42; Tr. at 934-35, 1183 ("Well, as I said, political scientists don't always agree, they sometimes disagree, but I can't find any disagreement with the notion that the rates of political participation,

voter turnout, particularly, is directly related to income and education.").)  In fact it is this social science understanding that informed Congress's determination that Plaintiffs need not prove that

---

Second, after the 2000 Charleston County School Board elections, for the first time in the history of the County, five of the nine school board members were African-American persons.  (Tr. at 566-67.)  After African-American school board members became a majority on that governing body, the Charleston County Legislative Delegation to the South Carolina General Assembly sponsored several pieces of legislation to alter the method of election for the school board in Charleston County.  (Tr. at 568.)  First, legislation was introduced that would have changed the method of election for the school board from non-partisan to partisan elections.  (Tr. at 568.)  Second, legislation was introduced to remove control of the budget of the school system from the School Board and place it under the jurisdiction of the County Council.  (Tr. at 571.)  Governor Hodges vetoed those enactments.  (Id.)  Prior to the introduction or consideration of these proposed bills effecting the method of election for the Charleston County School Board, none of the members of the local delegation contacted members of the majority-African-American School Board to seek their views on these electoral changes.  (Tr. at 568, 570-73, 607.)

As stated, these findings are appropriate to the totality of the inquiry and are serious enough to warrant specific mention.  Nonetheless under existing precedent the Court ultimately assigns them limited weight.

depressed socio-economic and educational status cause a finding of lower political participation. S. Rep. No. 97-417, 97th Cong. 2d Sess. 28, 29 & n.114 (1992); *see also White v. Regester*, 412 U.S. 755, 768 (1973).

The evidence establishes that African Americans in Charleston County participate at lower rates than do white persons. Plaintiff's expert, Dr. Arrington, and Defendants' expert, Dr. Weber, agree that African Americans register to vote at lower rates than whites, and African-American registered voters turn out at lower rates than white registered voters. (Tr. at 300-02; U.S. Ex. 15 at 23-24 & Table 1; Joint Ex. 2A at 24-31; Joint Ex. 2C at 7; see Tr. at 2974 (Dr. Moore acknowledging that white voter turnout at all age levels exceeds that of African-American turnout); Defs.' Ex. 14A at 40 (Table XXII).) The following table demonstrates the depressed levels of registration and turnout of African-American citizens, as compared to white citizens, in Charleston County between 1988 and 2000.

**Rates at Which White Persons' Political Participation Exceeds
That of African Americans in
Charleston County 1988-2000**

| Year | Registration as Percentage of Voting Age Population | Turnout as Percentage of Voting Age Population | Turnout as a percentage of registration |
|------|-----------------------------------------------------|-----------------------------------------------|------------------------------------------|
| 1988 | NA | NA | 10.3% |

| 1990 | 1.1% | 5.3% | 9.1% |
|------|------|------|------|
| 1992 | 6.5% | 9.4% | 7.7% |
| 1994 | 8.9% | 11.8% | 12.3% |
| 1996 | 0.5% | 8.0% | 7.3% |
| 1998 | 6.0% | 4.9% | 2.3% |
| 2000 | 10.7% | 13.5% | 9.1% |
| Mean | 5.6% | 8.8% | 8.3% |

(U.S. Ex. 15 at Table 1; see also Joint Ex. 2A at 26, 29 (Tables 4-5)).

Although not grossly disproportionate, the Court concludes that African-American voter registration and turnout have been depressed to a meaningful degree as compared to that of whites. Notwithstanding the 1998 election when voter registration and turnout were comparable, the disparity between the races in registration and turnout consistently approached double-digit percentiles.

Beyond the statistical evidence that African Americans participate at a lower rate than white persons, the Court received competent testimony that political participation is further impaired by the effect socio-economic disparities have on African-American access to important sources of financial and political power in Charleston County.

It is no secret that Charleston County continues to be separated along racial lines in its social, civic, and religious activities. (*See, e.g.*, Tr. at 189-90, 219-20, 556-57, 733, 816, 1379, 1495-1505, 1934, 2328.) This stratification is a direct holdover from more institutional discrimination and segregation and hinders the ability of African-American candidates to solicit

37

the support of white citizens.[24]  (See, e.g., Tr. at 125-26.)  The on-going racial separation that exists in Charleston County – socially, economically, religiously, in housing and business patterns – makes it especially difficult for African-American candidates seeking county-wide office to reach out to and communicate with the predominantly white electorate from whom they must obtain substantial support to win an at-large elections.  (See, e.g., Tr. at 1434, 1443.)

The evidence indicated that the membership of many social and civic organizations in the County is made up of one race or is nearly all-white or nearly all-African-American.  (Tr. at 219-20, 556-57, 662, 680-81,1867-68, 2538-39.)  Some prominent African-American citizens of the County testified that they had never been asked to join a predominately white social or civic organization in Charleston County even though these individuals were active in the social and civic organizations in the county's African-American community.  (Tr. at 113-14, 190-91, 1452.)  One of these individuals,  Bernard Fielding, the former Associate Probate Judge and Probate Judge of the County, a graduate of Boston University Law School, and a local attorney and business owner since the 1950s, (Tr. at 84-85, 91), testified that he has never been invited to join any predominantly-white social or civic organizations, (Tr. at 113-114).  Similarly, former State House member and State Senator, McKinley Washington, a public servant for almost 30 years, testified that he has never been asked to join a predominately white civic club

---

[24]     For these purposes, it is not important whether this racial separation is the result of acts that violate law, or whether they result from private behavior that is not regulated by law. What is important is the fact that members of the Charleston County community live social, economic and religious lives that many times do not result in members of one race having the opportunity to know members of another race, and the impact this racial separation has as a practical matter on the "past and present reality" of political life in Charleston County.  Senate Report at 30 (quoting White v. Regester, 412 U.S. 755, 769-70 (1973)).  This racial separation evidence is an additional indication of the importance of race in Charleston County Council elections.

such as the Rotary or Elks clubs.  (Tr. at 727.)

These social and civic organizations are obviously important bases of financial and political power typically targeted by political candidates, including those running for County Council,  (see, e.g., Tr. at 215, 219, 245).  Personal contacts with individuals and organizations are one of the most important factors in running for County Council.  (See Tr. at 214, 732, 784-85, 2547-48.)  Many times the people who contribute financially to local candidates are, of course, people the candidates know personally.[25]  (See, e.g., Tr. at 1533.)   The evidence, as previously considered, *supra* Section V.C.1 at 28 & n.21, demonstrates that past discrimination continues to result in great disparity between the wealth inherent in the African American community and that of the white community.  *De facto* separation of the races, therefore, exacerbates the socio-economic legacy of past discrimination by denying an African American candidate full access to the resources of the entire electorate and, further, by forcing her to instead rely on the stunted socio-economic development of her own community.

Anecdotally, African-American County Council candidate Rosemarie West, who ran in 2000, testified that she was not invited to speak to groups at Kiawah and Seabrook Islands, while white Democratic County Council candidate Edie Carson was invited.  (Tr. at 1310, 1340, 1343.)  In contrast, Councilmember Stavrinakis testified that he was invited to speak to numerous majority-white, as well as majority-African-American, social and civic groups during his 1998 campaign.  (Tr. at 1495-1505.)  Cindy Floyd, too, was invited to speak at candidates forums on the Isle of Palms and Sullivans Island at which her fellow African-American Democratic running

---

[25]     For instance, Councilmember Stavrinakis stated that about $49,000 of the approximately $50,000 he raised for his 1998 County Council campaign came from personal contacts.  (Tr. at 1491.)

mates were not present.  (Tr. at 244-245.)   Floyd testified that she "wouldn't imagine" that Freeman and  McCoy would have known of these important campaign opportunities.  (Id.)

Notwithstanding great improvements, it is clear that Charleston County remains to a large extent separated along racial lines and that this separation not only hinders the ability of African-American candidates to solicit the votes of white voters, but it further helps to explain the extent to which race infuses and informs the racially polarized voting patterns in Charleston County.

On the basis of this evidence, the Plaintiffs have demonstrated that African-American citizens in Charleston County suffer from a depressed socio-economic status in comparison with white citizens, and that this status is a direct legacy of Charleston County's history of official discrimination.   Moreover, the United States has demonstrated that this depressed socio-economic status makes it more difficult presently for Charleston County's African-American citizens to participate in the political process and elect candidates of choice.

D.     **Other Voting Procedures  That Enhance the Opportunity for Voting Discrimination**

The third Senate Factor considers the "extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group."  Senate Report at 29.  The evidence shows that this factor weighs heavily in favor of Plaintiffs.  In particular, the Court finds that the sheer size of Charleston County greatly exacerbates the effects of the socio-economic disparities between the races and makes this factor unconventionally significant.

1.     **Unusually Large Election District**

40

Charleston County is the largest and second most populated county in South Carolina. (U.S. Exs. 76-77, 106.)  Charleston County includes a stretch along the Atlantic Ocean of nearly 100 miles and contains several major waterways.  (U.S. Ex. 76.)  As stated, Charleston County is one of only three South Carolina counties that elects its entire county council at-large.  (U.S. Am. Comp. ¶ 11; Am. Answer ¶ 6.)  The other two counties, Hampton and Jasper, are rural counties with total populations of less than 22,000 residents in each county and comprised of a close balance of African-American and white citizens.  (U.S. Exs. 78, 106.)  Conversely, Charleston County has a total population that exceeds 300,000 and African Americans only comprise 34.3%  (U.S. Ex. 107.)

Several witnesses testified that these geographic and demographic features are an impediment to African-American candidates, who typically have fewer resources, and particularly because costly television advertising and direct mail are deemed important in local campaigns for County Council.  (Tr. at 302-03, 784-786; see also 213, 660, 1426, 1488-89, 1490, 1932-34; U.S. Ex. 14 at 51); *see Goosby v. Town Bd. of Town of Hempstead, N.Y.*, 180 F.3d 476, 494 (2d Cir. 1999) ("Campaign financing is especially difficult in such a large district for black candidates, who have been able to campaign more effectively in smaller districts in Nassau County.").

Financial resources directly impact a candidate's ability to win elections.  (Tr. at 895.) Several witnesses testified to the financial difficulties African-American candidates generally face in running election campaigns because they have less access to campaign resources than do white candidates.  (Tr. at 659-60, 1598-99.)  For example, in the 1998 campaign for County Council, African-American Democrat George Freeman raised $1,761.  (U.S. Ex. 65E.)  For that

41

same election, African-American Democrat Pearl McCoy raised $2,133.91. (U.S. Ex. 65H.) In comparison, white Democrat Cindy Floyd raised and spent $25,961.79 in 1998 during her successful County Council campaign. (U.S. Ex. 65D; Tr. at 225.) As stated, white Democrat Leon Stavrinakis spent $49,627.65 during his successful 1998 County Council race, all but $1,000 of which he raised from other people. (Tr. at 1491; U.S. Ex. 65J.)

John Tecklenburg has been active in the Charleston County Democratic Party since 1986. (Tr. at 778-79.) He worked with African-American candidates who ran countywide, particularly Virginia Morgan for County Council and Charles Green for Coroner in the 1992 election, as well as with white candidates. (Tr. at 786-90, 811-12.) In making fund-raising calls for Green and Morgan, Tecklenburg found that usually reliable campaign donors gave no money to Green or Morgan, or gave them less money than they gave to white candidates. (Tr. at 788-89, 811-12.) Likewise, Bernard Fielding testified that it was more difficult to raise campaign funds for African-American candidates than for white candidates in Charleston County, primarily because the white community has many more financial resources than does the African-American community.[26] (Tr. at 128.)

Additionally, Charleston County Democratic Chairperson, Diane Aghapour, testified that African-American Democratic candidates need to raise "a lot more money" than their white counterparts to "overcome a certain natural discomfort" that some white voters have with African-American candidates. (Tr. at 895.)

---

[26]    Judge Fielding is the one African-American candidate who had substantial campaign funds for a countywide race. In his 1994 race for probate judge, he spent approximately $70,000, half of which came from his own funds. (Tr. at 106.) He was nevertheless defeated. Judge Fielding testified that he believes that "the primary reason I was defeated [in the 1994 probate judge's race] was because I was black." (Tr. at 152.)

The combined effect of socio-economic disparities resulting from past-discrimination; contemporary bias in fund-raising; and the uncommonly large dimension and population of Charleston County works  a significant impediment to African Americans' ability to gain equal access to the electoral process in Charleston County.

### 2.    *De facto* **majority vote requirement**

Additionally, the United States' expert, Dr. Arrington, and the Private Plaintiffs' expert, Dr. John Ruoff, (Tr. at 410),[27] agree that staggering of terms, residency districts, and a primary nominating system serve as a *de facto* majority vote requirement[28] and limit the opportunities for single-shot voting.  The staggering of terms and the residency requirements ensure that all contests are either single-seat or two-seat contests.  Because the only viable candidates have been Democrats and Republicans, there are no more than two viable candidates for a single-seat or four viable candidates for two seats.  (Tr. at 303.)  Minority voters cannot single-shot vote in one seat elections.  In addition, single-shot voting[29] does not make sense strategically for African-American voters in two-seat contests for Charleston County Council.  (Tr. at 303-06, 2021, 2180-81; Ex.14 at 49-50.)  Accordingly, a *de facto* majority vote requirement makes it

---

[27]    Dr. Weber necessarily conceded as much, (Tr. at 2022-23), but discounted its materiality and testified that he had never before heard an expert testify to such an "in-effect" majority-vote requirement, (Tr. at 2024).

[28]    A majority vote requirement would require a prevailing candidate to receive not simply a plurality of the votes cast in an election but a mathematical majority.  (Tr. at 2022 (testifying that under a majority vote requirement, "a candidate to win the nomination of either political party must get -- either in the first primary or in the second runoff primary,  must get 50% plus 1 of the vote").)  Although no such majority vote requirement exists in Charleston County, (id.), when only a single county council seat is at issue in a two-party system (Democrats and Republicans) the winner will almost certainly garner a majority of the votes. (Tr. at 303.)

[29]    For a definition of single-shot voting, see *supra* footnote 18.

more difficult for the African-American community to employ a traditional strategy of bullet voting in order to improve their chances of electing candidates of their choosing.

### E.    Senate Factor 6: Racial Appeals in the Political Process

The Court is not greatly impressed with the force of evidence put forward on the sixth Senate factor: the extent to which subtle or overt racial appeals have characterized the political process in the jurisdiction.  Not that the United States did not make its case diligently, but by its very nature, the evidence on point, like the evidence of voter intimidation and harassment, tends to be anecdotal and probative more of isolated occasions rather than patterned behavior. Certainly, the Government succeeded in proving individual incidents of subtle or overt racial appeals by a preponderance of the evidence, but the Court ultimately finds their aggregate force to be of moderate value.

Most notably, the Court finds that some white candidates in Charleston County have traditionally used pictures of their African-American opponents on their campaign literature to alert white voters to the race of the African-American candidate.  (Tr. at 98, 949-51.)  For instance, in 1973, Sidi Limehouse used a photograph of his African-American opponent, McKinley Washington, in his campaign literature in a race for an at-large State House seat from Charleston County.   Limehouse won that election. (Tr. at 712-14.)[30]

In the 1988 Democratic Primary for House District 110, a white candidate distributed campaign literature that displayed a darkened picture of Robert Ford, his African-American

---

[30]    It should be noted that McKinley Washington was later elected to the South Carolina House and Senate and enjoyed lengthy tenures.

opponent.   The white candidate prevailed in that primary election.[31]  (Tr. at 565-66, 1109-10, 1602; U.S. Ex. 16 at 22 n.40.)

More recently, in the 1990 general election for Charleston County Probate Judge, a white candidate ran political advertisements in the *Post and Courier* that contained his photograph beside a darkened photograph of his African-American opponent, Bernard Fielding.  The white candidate also distributed campaign postcards in the white community with Fielding's picture on them.  (Tr. at 97-98, 954-55, 2921.)

In 1992, a white Republican State House candidate distributed campaign literature that included a darkened photograph of his African-American opponent, incumbent State Representative Lucille Whipper.  (U.S. Ex. 16 at 22; Tr. at 955-56, 2922-23.)  That same year, a white County Coroner candidate distributed campaign literature containing a photograph of her African-American opponent, Deputy Coroner Charles Green. (U.S. Ex. 16 at 22; Tr. at 956-57.)

In a 2000 State Legislative race between two white candidates, one campaign distributed literature with a darkened photograph of African-American Charleston County School Board member Elizabeth Alston.  (Tr. at 563-65, 898-99.)  Alston, however, had never been a resident of the House district in which that candidate ran in 2002, and no white school board members' photographs were used in this State legislative campaign.  (Tr. at 577, 626.)  Moreover, Alston did not give permission to the candidate to use her photograph in his campaign literature.  (Tr.

---

[31]     During this 1988 primary race, literature was distributed containing a caricature of Ford.  This campaign literature contains wording that indicates that it was produced by the Bailey campaign, but the testimonial evidence is silent as to which campaign actually distributed this document.  (Defs.' Ex. 30.)  Even if this literature was distributed by the Ford campaign, it further illustrates the salience of race in the political process.

at 563-65, 898-99.)

Dr. Moore testified that he could not recall a single instance where a white candidate in Charleston County used the photo of his or her white opponent in campaign literature. (Tr. at 2924.)

Moreover, to help overcome white voter resistance to African-American candidacies, there is evidence that African-American candidates have de-emphasized their race in Charleston County campaigns. For example, in 1980, Louis Waring used his photograph in campaign literature during his unsuccessful race for the St. Andrew's Public Service Commission. In his successful 1990 race for the same position, however, Waring decided that the use of his picture on his campaign literature "was not conducive to [his] candidacy." (Tr. at 1369; see also Tr. at 1289, 1367, 1399.) He testified that his photograph in the 1980 campaign had been a hindrance because, without it, some white voters would have believed he was a white person. (Tr. at 1369-71.) Likewise, Waring omitted his membership in the NAACP from his 1990 campaign literature, after having listed that membership in his 1980 literature. (Tr. at 1371.)

White County Council candidates have felt free to use their photographs in their campaign literature. (See, e.g., Tr. at 221, 1493-94.)

William Runyon, who has been involved in the Charleston County Democratic Party for over twenty years as a candidate, party official, and adviser, testified that he has advised African-American candidates to de-emphasize their race when running for office. (Tr. at 1599-1600.) For example, he advised African-American candidates not to list membership in organizations like the NAACP in their campaign literature. (Tr. at 1600.) Additionally, McKinley Washington, who represented majority-African-American districts in the South

Carolina House and Senate from 1974-2000, testified that he always advises African-American candidates that "they had a better shot" by not using their own photographs in campaign literature.  (Tr. at 727-28.)

Similarly, Charleston County School Board member Elizabeth Alston stated that she did not use her photograph on her campaign signs during her 1992 County Council race because a number of her African-American supporters advised her that the use of her photograph would not benefit her campaign.  (Tr. at 548-49.)  Current Democratic Party Chairperson Diane Aghapour testified that she advises African-American candidates not to use their photographs in direct mail advertising.  (Tr. at 895.)  Indeed,  Aghapour gave that advice most recently to Pearl Ascue, an African-American Democratic candidate for County Council running in 2002. (Tr. at 895-96.)

A bizarre 1990 episode reflects the continuing role of racial appeals in Charleston County's political system.  That year a Charleston-based political consultant ran the campaign of his sister, a candidate for Lt. Governor.  Concerned that conservative low-country voters might stay home, the consultant bankrolled Benjamin Hunt, Jr., a nearly illiterate African-American man, to run in the primary against the incumbent United States Representative Arthur Ravenel.  The political consultant believed that this would bring out more anti-black voters in the low-country area and help his sister in the primary against her major opponent whose strength lay in the middle and upper part of the state.  He paid Hunt's filing fee and gave him $500.  Hunt, who had never voted, took no part in the campaign beyond allowing his picture to be taken.  The consultant mailed out thousands of "Hunt for Congress" leaflets showing a photograph of Hunt with a Kentucky Fried Chicken sign in the background.  The *News and*

*Courier* reported that the consultant had his clients publish pictures of black challengers, but he never had them publish pictures of white challengers. (U.S. Ex. 16 at 21-22; Tr. at 953-54; see also Tr. at 2545.)

Jimmy Stuckey, who has been active in the Charleston Democratic Party for approximately 30 years, testified that some whites believed that the Democratic Party is "controlled" by African Americans. (Tr. at 2549.) William Runyon, who has been active in the Charleston County Democratic Party for more than 20 years, testified that, in recent years, he has heard the Democratic Party referred to as the party of the African-Americans. (Tr. at 1601.)

Clearly, racial appeals have been and continue to be a part of the political dialogue in Charleston County, to some degree; and while these testimonial accounts and incidents are not exhaustive, neither are they pervasive. Accordingly, they cannot be determinative of that degree.

## VI.     Additional Factors[32]

As stated, the Senate has also recognized the following "[a]dditional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation":

•  whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group [and]

•  whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Id.* at 29 (footnotes omitted).

Although the Court received evidence on both factors, the United States has not put them

---

[32]     The United States has not asserted that the fourth Senate Factor, denied access to a candidate slating, is an element of their case.

at issue.  Specifically, The United States' Amended Complaint did not allege that the policy underlying the at-large method of election is tenuous and further moved to limit the Defendants from putting forward evidence of responsiveness.  The Court has considered all of the evidence related to the factors of tenuousness and responsiveness and finds that they do not materially contribute to the Court's conclusion.

## VII.    Charleston County's Partisanship Defense

Throughout, Defendants have rather singularly insisted upon hanging the proverbial "hat" of their defense on the contention that the "cause" of voting polarization in Charleston County is partisan differences rather than racial ones.[33]  Specifically, Defendants contend that Section 2's "on account of race or color"[34] language necessarily requires Plaintiffs to show that race explains the pattern of defeat of minority-preferred candidates.

As stated, the Supreme Court interpreted Section 2 to provide a minority group with an

---

[33]    On the basis of both *Gingles* and the Fourth Circuit's decision in *Lewis v. Alamance County*, 99 F.3d 600, 615 (4th Cir. 1996), the Court has already rejected Defendants' argument at summary judgment that issues of "causation" had any place in the Court's consideration of the three *Gingles* preconditions.

[34]    Section 2 is divided into two subsections, 2(a) and 2(b).  42 U.S.C. § 1973.  Subsection 2(a) forbids any voting practice "which *results* in a denial or abridgement of the right of any citizen of the United States to vote *on account of race or color*, or in contravention of the guarantees in section 4(f)(2), *as provided in subsection (b)*.  42 U.S.C. § 1973(a) (emphasis added).  Plaintiffs, therefore, contend that what constitutes voting discrimination "on account of race or color" is defined in subsection 2(b).  *Id.*  Specifically, Plaintiffs argue that Subsection 2(b) makes it clear that a violation exists when it is shown that a racial group lacks equal opportunities and equal results which constitute a violation, regardless of the reasons why such inequality exists: "A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the [jurisdiction] are not equally open to participation by members of a class [protected by subsection 2(a)] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  42 U.S.C. § 1973(b).

equal opportunity to the electoral process.  The central and dispositive question is "whether the use of a contested electoral practice or structure results in members of a protected group having less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Gingles*, 478 U.S. at 63.  The Fourth Circuit, in *Lewis v. Alamance County*, 99 F.3d 600, 615 (4th Cir. 1996), has concluded that causation may be one of many issues relevant to the totality of circumstances although irrelevant to the analysis of the *Gingles* preconditions.  *Id*. at 615 n.12.  Importantly, however, *Lewis* does not require plaintiffs to prove that race has caused the inequality of result.  Nor did it hold that proof of factors other than race, like partisanship, constitute a complete defense.  *See id.*

In *Goosby v. Town Bd. of Town of Hempstead, N.Y.*, 180 F.3d 476 (2d Cir. 1999), the Second Circuit expressly recognized the Fourth Circuit's approach in *Lewis* and held that partisanship is not a defense to a Section 2 claim.  In *Goosby* -- as in this present case -- "the principal and pervasive argument of the Town [was] that political partisanship, rather than race, account[ed] for the defeat of black candidates."  *Goosby*, 180 F.3d at 495.   Republican candidates had always won Town Board elections and African-American voters usually supported losing candidates.  *Id*. at 484, 489, 492.   The Town Board included an African-American Republican.  *Id.* at 486.  Expressly adopting the Fourth Circuit standard in *Alamance County*, the Second Circuit stated that the partisanship issue was relevant to the totality of circumstance analysis but not relevant to the *Gingles* preconditions.  *Id*. at 492-93.

The Second Circuit, moreover, firmly rejected the partisanship defense.  Indeed, the court stated that the defendants' partisanship defense

> represent[ed] a fundamental misunderstanding of what the plaintiff class alleged
> and proved to the satisfaction of the district court.  The claim was that the

at-large system of voting made it impossible for blacks to elect their *preferred candidates*.  The Town's argument implies that if blacks registered and voted as Republicans, they would be able to elect the candidates they prefer.  But they are not able to elect preferred candidates under the Republican Party regime that rules in the Town.  Moreover, blacks should not be constrained to vote for Republicans who are not their preferred candidates.

*Id*. at 495-96 (emphasis in original).

Defendants rely on the conclusion of other circuits that proof of race-neutral causes of observed voting patterns can defeat a claim of minority vote dilution.  In *League of United Latin American Citiszens, Council No. 4434 (LULAC) v. Clements*, 999 F.2d 831 (5th Cir. 1993) (en banc), *Nipper v. Smith*, 39 F.3d 1494 (11th Cir. 1994) (en banc), and *Uno v. City of Holyoke*, 73 F.3d 973 (1st Cir. 1995), the circuit courts of appeal recognized the relevance of proof that the majority's voting behavior could best be explained by such race-neutral reasons as political partisanship or party affiliation, unrelated to the minority-preferred status of the defeated candidate.  *See, e.g., LULAC*, 999 F.2d at 850-51.  Specifically, the courts recognized that a vote dilution claim could be defeated by proof that these race-neutral reasons in fact provided the best explanation for electoral outcomes.

In *LULAC*, for example, the district court excluded evidence tending to show divergent voting patterns were attributable to race-neutral factors, finding that such evidence was irrelevant and legally incompetent.  Reversing, the Fifth Circuit emphasized that Section 2's "rigorous protection" extended only to "defeats experienced by voters 'on account of race or color.'"[35]  *LULAC*, 999 F.2d at 850.  In rejecting the district court's construction and

---

[35]     To the extent *LULAC*, *Nipper*, or *Uno* might suggest that "on account of race or color" narrowly concerns the cause of divergence in majority and minority voting preferences and requires some proof that the white majority *votes* differently because of racial animus, the Court disagrees.  As the Senate factors plainly suggest, "on account of race or color" is a more

interpretation of the relevance of the circumstances surrounding electoral results, the Fifth

Circuit emphasized:

> Without an inquiry into the circumstances underlying unfavorable election returns, courts lack the tools to discern results that are in any sense "discriminatory," and any dissension between deprivation and their losses at the polls becomes untenable in holding that the failure of minority-preferred candidates to receive support from a majority of whites on a regular basis, without more, sufficed to prove legally significant racial bloc voting, the District Court unloosed Section 2 from its racial tether and fused illegal vote dilution and political defeat.

*Id.*

At bottom, there is little difference between the Fifth Circuit's decision in *LULAC* and

the Fourth Circuit's decision in *Alamance County* for purposes of this case. In fact, the Fourth

Circuit explicitly agreed with the Fifth Circuit to the extent its decision in *LULAC* found "cause"

to be relevant to the ultimate inquiry. *Alamance County*, 99 F.3d at 615. *Alamance County*

simply teaches that the Court should consider evidence of causation within the totality of its

inquiry. As stated, however, *Alamance County* implies no requirement that Plaintiffs prove that

the inequality of result is caused by race and, conversely, suggests no guarantee that proof of

race-neutral factors will operate as a complete defense.

Therefore, in keeping with the Fourth Circuit's instruction the Court allowed both parties

opportunity at trial to develop a full record concerning causation and received significant expert

---

far-reaching requirement that the Court consider the totality of pressure points which racial discrimination and disadvantage might aggravate, including, for example, the present effect of past discrimination on socio-economic status and, therefore, on political participation. Depressed socio-economic status from past discrimination which results in severely diminished political participation could constitute a "denial or abridgement of the right to vote . . . on account of race or color," without regard to any present racial animus of the white electorate in their voting preferences.

testimony to that end.  The Court will consider such evidence and fold any findings into its totality of the circumstances inquiry.

Initially, the Court finds the issue of voting-causation to be desperately illusive.  As a theoretical matter, the Court is inclined to reject the possibility that any methodology might be able to adequately identify a singular or even dominant cause of a community's corporate voting behavior, which is in fact the aggregation of an innumerable series of individualized choices and pluralistic discretions made by thousands of people generally out of any meaningful political association with one another.  Certainly where there is a consistent pattern of cohesive voting among a community of voters, as is here, the decisional nuances over the particularized issues of any single individual's vote begin to fall away, and more global factors such as race and socio-economic status begin to emerge as likely explanations for the pervasive commonality in voting behavior among communities of race.  Nonetheless, the Court is dissatisfied with the speculation of associating cause with the voting polarization evidenced by the Record in this case.  The task of separating out the individual influence of race and party is a weighty one.

Consistent with these concerns, Dr. Arrington, expert for the United States, testified that the multi-colinearity[36] of these more global causes of race and partisan affiliation in Charleston County elections renders the individual force exerted by any one cause nearly inextricable from the influence of the other.  (Tr. at 310.)  Dr. Arrington testified, further, that even if the experts

---

[36]    In statistical analysis, multi-colinearity is a correlation between two independent variables that is so strong that it is impossible "statistically to separate them out and tell which of those two effects the dependent variable; which of those two is the cause."  (Tr. at 310.)

had attempted to conduct a multivariate analysis[37] that "you could not pull out statistically the difference between partisanship and race." (Tr. at 310.) Dr. Weber, expert for Defendants, further acknowledged that he could not, with a reasonable degree of social science certainty, determine the extent to which racial attitudes caused polarized voting in Charleston County, and that he believed factors of race and partisanship are "inextricably intertwined" in such a way that they could not be separated statistically, to wit, they are multi-colinear. (Tr. at 238-39, 2220-21.)

Moreover, it is clear from the Record that to the extent other methodologies or models might begin to partly unbraid the intertwined influence of race and partisan affiliation, these methodologies could not have been employed in this case or have not been employed to a satisfactory degree.

Both Dr. Arrington, (Tr. at 309-310), and Dr. Weber, (Tr. at 1992-93), agree that party registration data and survey research are the primary sources of data relied on by political scientists in drawing conclusions concerning the effect of political partisanship on election results. It is also agreed that neither type of data is available concerning Charleston County elections because there is no requirement that voters register by party for general elections and no relevant survey research has been conducted. (See, e.g., Tr. at 309.)

Dr. Weber identified consideration of "behavioral partisanship" as a third methodology for measuring the effect of partisanship on election results. (Tr. at 1980, 1992-93.) This methodology looks at the "past behavior of voters." (Tr. at 1993.) In his behavioral analysis at

---

[37]    A multivariate analysis attempts to measure the effect of two or more independent variables on the dependent variable as opposed to a more traditional analysis, which would control for only a single independent variable.

trial, Dr. Weber first focused on party-switching and the effect it had on the African-American support for candidates, Dr. Charles Wallace, for County Council and Keith Summey, for the Mayorship of North Charleston.  Dr. Weber observed that Dr. Wallace was significantly supported by the African-American community as a Democrat, but received "virtually no support from the nonwhite community" after his affiliation with the Republican party.  (Tr. at 1997.) Dr. Weber also identified Mayor Summey as another candidate who received significant African American support "as a Democrat happened to lose but, again, then comes back and runs as a  Republican and wins."  (Tr. at 1997.)

Dr. Weber further testified that the election of Timothy Scott, an African American candidate, to County Council demonstrates that partisanship not race is the cause of polarization and patterned-defeat.  Dr. Weber stated that "if you think that the voters are cued on race - race is the reason why they are going to not vote for a candidate - you would expect that the voters, assuming that they are aware that  Scott is an African-American candidate, that the white voters would not vote for him."  (Tr. at 1998.)

Finally, Dr. Weber discussed the success of African-American candidates in County School Board races as further evidence that party and not race was the primary cause of polarization and patterned-defeat.  Specifically, Dr. Weber testified that the School Board races

> are different in character than the elections for Countywide State or national office, because these are elections that are conducted without partisan designation.  So the voter does not know unless the voter is very well informed or has been contacted by parties, for example, to say, this is the Democrat or, this is the Republican, or anything like that.  So a lot of voters are lacking in the partisan information.  And I did this to control for the possibility that there would be racial polarization in such nonpartisan elections which would be confirmatory or perhaps denied the findings in  the partisan general elections.

55

(Tr. at 2001-02.)  Dr. Weber concluded that without the "partisan cue" polarization was less severe, suggesting again that party and not race was the better explanation for the patterned defeat of minority-preferred candidates.

The Court is unpersuaded by the behavioral analysis of Dr. Weber.  First, the analysis is insufficiently comprehensive.  While Dr. Weber did not fully explain his behavioral methodology, which is admittedly recognized by only a segment of the social science literature, (Tr. at 1993), the Court suspects that it requires a more exacting inquiry than has been conducted here, including in the least a measurement of precinct voting patterns and candidate platforms over a course of elections.  In fact, Dr. Weber stated that in determining whether partisanship is a better explanation for polarized voting patterns than race in Charleston County, he would want to consider the nature of the campaigns, the issues raised in those campaigns, newspaper endorsement of candidates,  mobilization efforts during those elections, and field survey research, including voter interviews.  (Tr. at 2054-65, 2082, 2093, 2168, 2170-71; see also 2994-96.)  No such efforts have been made.  The Court simply cannot conclude on the strength of isolated instances that party affiliation better explains the patterned-defeat in Charleston County.  Moreover, as the ultimate factfinder, the Court views the behavioral analysis conducted by Dr. Weber as inherently more speculative and subjective than the other methodologies identified by the experts for proving cause and therefore assigns it less weight.  *Cf., e.g., Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 265 (4th Cir.1999); *Benedi v. McNeil-P.P.C., Inc.* 66 F.3d 1378, 1385  (4th Cir. 1995).  For the same reason, the Court is certain that even a more involved

behavioral analysis would not have compelled a different conclusion.[38]

Further, the Court disagrees that Dr. Weber's conclusions properly follow from his observations. As discussed, *supra* Section V.B at 19, the success of African-American candidates in the School Board races has already been adequately explained by special circumstances unique to those elections. As for the effects of party-switching, the Court is not sure that this evidence is even probative of the causation issue at all. Evidence of dramatically depressed African American support for Dr. Wallace after his re-affiliation with the Republican party moves the Court no closer to understanding why whites consistently identify with the Republican party and why African Americans so consistently identify with the Democrat party, or why such consistent correlation results in a patterned defeat of African-American preferred candidates in Charleston County. It certainly does not explain, in any respect, why African Americans abandoned their support for Dr. Wallace. Notwithstanding whatever ideological position Dr. Wallace may have held after his re-affiliation, the reasonable African American voter might have formed any number of conclusions concerning the meaning and effect of his party-switch. Dr. Wallace's loss of support only tends to reinforce that which the Court already knows -- cohesion in Charleston County is stalwart. As stated, whether such unbending correlation between race and party is driven by race or ideology or, as the Court suspects, some cross-pollenization of both is frustratingly beyond the capacity of the Court and the evidence before it, and it remains a mystery that Dr. Wallace's election or Mayor Summey's[39] election do

---

[38]    It should be noted that much of Dr. Weber's research concerning behavioral partisanship was submitted in an untimely declaration properly rejected by the Magistrate Judge.

[39]    The Court cannot identify any evidence that Mayor Summey lost the support of African Americans upon his re-affiliation with the Republican party.

little to illuminate.

Finally, Timothy Scott's election to County Council certainly demonstrates that his race was not a fatal impediment to either significant white support or his ultimate success. Alone, however, his election can do little to proving the ultimate cause of legally-significant, preferred-candidate defeat in Charleston County. As demonstrated, his elections have been the exception in Charleston County, and the Supreme Court has made it clear that the decisive evidence regarding voting patterns is what *usually* occurs in a jurisdiction, and not aberrational election results produced by special circumstances. *See Gingles*, 478 U.S. at 57 n.26. Indeed, Dr. Weber stated that political scientists study voting by looking at "overall patterns." (Tr. at 2225-26, 2091.) Here, Scott not only received white support not received by other African-American candidates -- regardless of party -- but he received unprecedented financial support ($5,000) in a local election from the South Carolina Republican Party and other sources. (Tr. at 2311, 2317-18.) No other current Republican County Councilmember received *any* direct financial support from the State Republican Party. (See U.S. Exs. 65A-C, F-G, and K, financial disclosure statements for current Republican Charleston County Councilmembers other than Scott). In fact, Dr. Wallace acknowledged that such support was not merely unusual but unheard of. (Tr. at 1791.) With the help of Buck Limehouse, the State Republican party, and others, Scott raised an unprecedented $20,000 to $25,000 for the 1995 special election, a sum Scott described as "substantial." (Tr. at 2311.)

Notably, each of his elections were still characterized by racial polarization and the ultimate defeat of the African-American preferred candidate.

Accordingly, Dr. Weber's behavioral analysis, to the satisfaction of the Court, does not

58

demonstrate that anything other than race explains the voting polarization in Charleston County.[40]

Although he admittedly did not conduct a traditional analysis of causation, the United States' expert, Dr. Arrington, offered an opinion as to whether race had caused the pattern of polarized voting between white and African-American voters. Dr. Arrington opined that race, and not partisan affiliation, was the main reason why white and African-American voters voted differently.

As a preliminary matter, Dr. Arrington noted that the statistical methods of bivariate ecological regression analysis and extreme case analysis used by all the statistical experts in this case indicate *how* people voted but not *why* people voted for particular candidates. (Tr. at 308 ("But about why they vote the way they do when they get there, that's a new field for me.").) As stated, Dr. Arrington found that partisanship and race are closely intertwined in Charleston County, and both are highly correlated to how voters vote. (Tr. at 310-311.) Thus, it is undisputed that race, partisanship, and vote are highly correlated.

Dr. Arrington, however, introduced the following theoretical model to demonstrate that race must be the primary cause of voter choices. (See U.S. Ex. 111; Tr. at 311-14.) The model considered three variables and how they each exercised force in relation to one another: race,

---

[40]    Defendants also contend that pervasive use by African Americans of the Master Lever on the Shouptronic voting machines contributes to the polarization of voting and proves that party and not race is the cause of such polarization. First, there is no evidence of the extent to which the Master Lever is exercised by the African-American community. Second, even if African Americans consistently use the Master Lever, it still cannot be understood whether this strong affiliation with the Democratic party, manifested through exercise of the Master Lever, is for racial or non-racial reasons.

party affiliation, and the ultimate vote.  A person's vote *cannot* cause or influence a person's race or partisan affiliation.  On the other hand, a person's race or partisan affiliation *can* influence how that person votes.  In regard to race and partisanship, a person's race can be the cause of their partisan affiliation; but the converse cannot be true because race is an immutable characteristic.  Dr. Arrington concluded, therefore, that race must be the key causal variable because it can cause vote directly and it can also cause vote through the mediating variable of partisanship.  *Id.*

However, Dr. Arrington's model is also unsatisfactory.  Although the relational axioms are true, the conclusion is a non-sequitur.  Certainly race is the only variable of the three which can inform both of the remaining variables, but the model cannot demonstrate that race exerts the *greatest* influence.  In other words, the combined force that race exerts over a person's vote-- the force exercised over the ultimate vote *directly* plus the force as *mediated* through party-- still may be less than the total force that party alone (ideology) exerts over the ultimate vote.  For example, (assigning generic units of measure to the force exercised) race might exercise a force of 10 units *directly* and another 10 units out of a 100 mediated through party, but the party variable alone would still exercise 90 units of force independently.  The model can only explain *how many* avenues of influence race enjoys and *not how great* or strong that aggregate influence is.

In sum, the experts have not conducted an analysis of causation, in great part, because the necessary data is not available.  To the extent methodologies and models have been used to assist the Court in coming to a conclusion, they have produced somewhat unsatisfactory results.  As stated, however, the problem lies inherently in the morass of the causal inquiry itself, and not

in the thoughtful consideration of the experts' observations.  The Court finds that the influence of race and party on voting patterns in Charleston County, on the facts of this case, are too closely related to isolate and measure for effect.  The Court, therefore, concludes that the evidence fails to demonstrate that race-neutral factors explain the voting polarization in Charleston County.

Therefore, remaining mindful that Plaintiffs need not prove any particular number of Senate factors or that a majority of them point "one way or the other," *Gingles*, 478 U.S. at 45, the Court concludes that evidence under Senate factors seven, two, and three of severe voting polarization, minimal minority electoral success, and an uncommonly large voting district decisively points towards a violation of Section 2.  The combined strength of the evidence under Senate factors one and five of depressed political participation as a result of pervasive past discrimination in education and employment and past discrimination touching the right to vote also weighs in favor of a finding that the at-large system violates Section 2.  Evidence of racial appeals has not materially assisted the Court in reaching a conclusion.  Finally, there is no evidence that anything other than race explains the severe voting polarization observed in Charleston County Council elections.

The Court therefore concludes, viewing the totality of the circumstances, that the at-large system of election for the Charleston County Council unlawfully denies African Americans equal access to the electoral process in contravention of Section 2 of the Voting Rights Act.  African Americans in Charleston County, on account of their race, have inherited a depressed socio-economic posture which hinders political participation and exacerbates the effect of already severely polarized voting.

### VIII.  Constitutional Claim of Private Plaintiffs

Notwithstanding the Court's determination that the at-large electoral system results in unequal access to the electoral process for African Americans, it cannot conclude on the evidence before it that such system was adopted with the intent to discriminate.  The Court, therefore, rejects the claim of the private Plaintiffs that the adoption of the at-large system for electing members of the Charleston County Council was motivated by a racially discriminatory purpose in violation of the intent standard of Section 2 and the 14th Amendment of the United States Constitution.

The United States Supreme Court has emphasized that racially discriminatory motivation is a necessary ingredient of a 14th and 15th Amendment violation.[41]  *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977); *Washington v. Davis*, 426 U.S. 229 (1976); *Reno v. Bossier Parish Sch. Bd.*, 117 S.Ct. 1491, 1502-03 (1997) (noting applicability of *Arlington Heights* analysis in vote dilution cases); *City of Mobile v. Bolden*, 446 U.S. 55 (1980) (controlling principles for assessing 14th and 15th Amendment claims); *Whitcomb v. Chavis*, 403 U.S. 124 (1971); *see also Irby v. Virginia State Board of Elections*, 889 F.2d 1352, 1355 (4th Cir. 1989) ("To establish an equal protection violation, a plaintiff must show discriminatory intent as well as disparate effect."); *Washington v. Finlay*, 664 F.2d 913, 919 (4th Cir. 1981), *cert. denied*, 457 U.S. 1120 (1982).  In order to establish a violation of the

---

[41]    As stated, claims of intentional discrimination under Section 2 are assessed according to the standards applied to constitutional claims of intentional racial discrimination in voting.  *See Garza v. County of Los Angeles*, 918 F.2d 763, 766 (9th Cir. 1990) ("[T]he Voting Rights Act can be violated by both intentional discrimination in the drawing of district lines and facially neutral apportionment schemes that have the effect of diluting minority votes.")

Equal Protection Clause of the 14th Amendment, the burden is upon the private Plaintiffs to show discriminatory purpose and effect.

"Discriminatory purpose" implies more than "intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of' . . . its adverse effects upon an identifiable group." *McClesky v. Kemp*, 481 U.S. 279, 298 (1987). Under *Arlington Heights*,[42] discriminatory purpose may be established by proof that Charleston County used race as a motivating factor in establishing and maintaining the present at-large electoral system. *Arlington Heights*, 429 U.S. at 265-66.

In determining the ultimate issue in an *Arlington Heights* analysis of whether there is sufficient evidence to suggest invidious discriminatory purpose as a motivating factor, the Court is called upon to make "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available," *id*. at 265, and should consider the following factors in assessing whether such a purpose or discriminatory intent was in fact a motivating factor in a jurisdiction's enactment of legislation:

(1)     Whether impact of the official action bears more heavily on one race than another;

(2)     The historical background of the jurisdiction's decision;

(3)     The specific sequence of events leading up to the challenged decision;

(4)     Departures from the normal procedural sequence; and

(5)     The legislative and administrative history, especially any contemporary statements by members of the decision-making body.

---

[42]     The Senate report expressly incorporates the considerations in *Arlington Heights* for purposes of analyzing a Section 2 intent standard claim. S. Rep. No. 417 at 27 n.108.

*Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. at 265; *Washington v. Davis*, 426 U.S. at 241-42.

The private Plaintiffs rely largely on temporal evidence to prove that the at-large electoral system was adopted for invidious and discriminatory purposes. Specifically the private Plaintiffs contend that the at-large system was a known device for diluting minority voting strength, increasingly used throughout the South, and conspicuously adopted after the passage of the Voting Rights Act and in response to increased African American registration and political activity. Private Plaintiffs point to other actions taken during the same period to insulate white control of the electorate including the annexations of white populations to maintain Charleston as a majority white city, abolishing elections for the school board in majority African-American districts only, and racially motivated opposition to school consolidation on the grounds that it would lead to integration.[43]

Certainly "historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 267. However, Charleston County also put forward competent evidence that the legislation enacted in 1969 to change the method of election was, in fact, accomplished to satisfy the one-person, one-vote mandate of the United States Supreme Court in *Reynolds v. Sims,* 377 U.S. 533

---

[43] The Court primarily received evidence of discriminatory intent through the lengthy examination of Dr. Vernon Burton. (Tr. 1127 - 1253.) While the Court received further credible testimony, which it considered probative of a lack of discriminatory intent, from Lenny Krawcheck, a very credible member of the legislative delegation at the time of the adoption of the at-large system, the Court remains mindful of the Supreme Court's warning in *Arlington Heights*, that testimony of original decision-makers should be cautiously considered only under extraordinary circumstances. For that reason, his testimony bears little on the decision of the Court.

(1964) and *Avery v. Midland County*, 390 U.S. 474 (1968).[44]  Unfortunately, there is neither legislative history nor contemporaneous accounts or statements made by decision makers to further illuminate the inquiry.  The change to the at-large system might reasonably be explained in the context of either of the historical explanations advanced by Plaintiffs and Defendants, respectively, and the evidence fails to convince the Court that some invidious discriminatory purpose was, in fact, the motivating factor over compliance with the one-man one-vote requirement.

Of the remaining *Arlington Heights* considerations, there is no evidence of a departure in normal procedures.  It is clear, however, as evidenced by the totality of the circumstances inquiry, that any ill effects of the at-large system have fallen squarely on the shoulders of the African American community.  Although a clear pattern of disparate burden, unexplainable on grounds other than race, can sometimes emerge "from the effect of the state action even when the governing legislation appears neutral on its face," *Arlington Heights*, 429 U.S. at 266 (citing *Yick Wo v. Hopkins*, 118 U.S. 356 (1886); *Guinn v. United States*, 238 U.S. 347 (1915); *Lane v. Wilson*, 307 U.S. 268 (1939); *Gomillion v. Lightfoot*, 364 U.S. 339 (1960)), such cases are rare and "[a]bsent a pattern as stark as that in *Gomillion* or *Yick Wo*, impact alone is not determinative, and the Court must look to other evidence," *Arlington Heights*, 429 U.S. at 266. This case is not one of those rare instances.

While the Court may deduce intent from circumstantial evidence, it cannot on the

---

[44]    The private Plaintiffs counter that the South Carolina Attorney General advised the County that the Supreme Court's decision in *Avery* did not require at-large voting for the County Council.  This evidence alone does not, however, disprove that it was not in fact adopted for such reason.

evidence before it conclude that the at-large system was adopted for discriminatory purposes. Certainly the timing of the General Assembly's adoption of the at-large system raises suspicions, but the Court will not disparage its authors without more compelling evidence, particularly in light of other reasonable and historical explanations for the adoption of the at-large system. The private Plaintiffs' constitutional claim and claim based on the intent standard of Section 2 are, therefore, denied.

## **CONCLUSION**

To the satisfaction of the Court and by a preponderance of the evidence, both the United

States and the Private Plaintiffs have demonstrated that the at-large system of elections for the Charleston County Council denies African Americans, on account of their race and color, equal access to the electoral and political process, in contravention of Section 2 of the Voting Rights Act. Accordingly, it is hereby **DECLARED** that Charleston County's at-large method of election is illegal and cannot be enforced in future elections. It is, therefore, **ORDERED**, that any further use of the at-large system of election for the Charleston County Council is hereby **ENJOINED.** The Private Plaintiffs, however, have failed to establish their constitutional claims. Accordingly, such claims for relief as are based upon the intent standard of Section 2 of the Voting Rights Act and the United States Constitution are hereby **DENIED.**

     **AND IT IS SO ORDERED.**

                                   PATRICK MICHAEL DUFFY
                                   United States District Judge

Charleston, South Carolina
March 6, 2003

67